## THE LOTTAWANNA.

1. Whilst the general maritime law is the basis of the maritime law of the United States, as well as of other countries, it is only so far operative in this, or any country, as it is adopted by the laws and usages thereof. It has no inherent force of its own.
2. In particular matters, especially such as approach a merely municipal character, the received maritime law may differ in different countries without affecting the general integrity of the system as a harmonious whole.
3. The general system of maritime law which was familiar to the lawyers and statesmen of this country when the Constitution was adopted, was intended, and referred to, when it was declared in that instrument, that the judicial power of the United States shall extend "to all cases of admiralty and maritime jurisdiction." Thus adopted, it became the maritime law of the United States, operating uniformly in the whole country.
4. The question as to the true limits of maritime law and admiralty juris- diction is exclusively a judicial question, and no State law or act of Congress can make it broader or narrower than the judicial power may determine those limits to be. But what the law is within those limits, assuming the general maritime law to be the basis of the system, de- pends on what has been received as law in the maritime usages of this country, and on such legislation as may have been competent to affect it.
5. The decisions of this court illustrative of these sources, and giving con- struction to the laws and Constitution, are especially to be considered; and when these fail us, we must resort to the principles by which they have been governed.

* Crewell *v.* Randell, 10 Peters, 392; Suydam *v.* Williamson, 20 How ard, 440.

6. It is settled, by repeated adjudications of this court, that material-men furnishing repairs and supplies to a vessel in her home port do not acquire thereby any lien upon the vessel by the general maritime law as received in the United States

7. Whilst it cannot be supposed that the framers of the Constitution contemplated that the maritime law should remain unchanged, the courts cannot change it; they can only declare it. If within its proper scope, any change is desired in its rules, other than those of procedure, it must be made by the legislative department.

8. *Semble*, that Congress, under the power to regulate commerce, has authority to establish a lien on vessels of the United States in favor of material-men, uniform throughout the whole country.

9. In particular cases, in which Congress has not exercised the power of regulating commerce, with which it is invested by the Constitution, and where the subject does not in its nature require the exclusive exercise of that power, the States, until Congress acts, may continue to legislate.

10. Hence, liens granted by the laws of a State in favor of material-men for furnishing necessaries to a vessel in her home port in said State are valid, though the contract to furnish the same is a maritime contract, and can only be enforced by proceedings *in rem* in the District Courts of the United States.

11. Any person having a specific lien on, or a vested right in, a surplus fund in court, may apply by petition for the protection of his interest under the forty-third admiralty rule.

12. Separate libels were filed in 1871, against a steamboat, for wages for salvage, for supplies furnished at her home port, and for the amount due on a mortgage. *Held*, on the evidence, that the lien for supplies had not been perfected under the State law; and, if it had been, that the libels for such supplies could not be sustained prior to the recent change in the twelfth admiralty rule. *Held*, also, that the libel upon the mortgage could not be sustained as an original proceeding, but that the mortgagees, having petitioned for the surplus proceeds of the vessel, were entitled to have the same applied to their mortgage.

APPEAL in admiralty from the Circuit Court for the District of Louisiana.

The case was thus:

In the year 1819 this court, in *The General Smith*,* decided (as the profession has generally understood), that in respect to repairs or necessaries furnished to a ship in the port or State to which she belongs, no lien is implied unless it is recognized by the municipal law of the State; declaring the

---

* 4 Wheaton, 443.

rule herein to be different from that where the repairs or necessaries are furnished to a foreign ship; in which case it was admitted that the maritime law of the United States gives the party a lien on the ship itself for his security.

In view of this decision most or all of the States enacted laws giving a lien for the protection of material-men in such cases.

In the year 1833, in the case of *The Planter*,* the converse of the rule in *The General Smith* was laid down, and process against a vessel in her home port was used and supported, the State law giving a lien in the case.

In 1844, this court, acting in pursuance of acts of Congress which authorized it to adopt rules of practice in the courts of the United States in causes of admiralty and maritime jurisdiction† (and adhering to the practice declared as proper in the cases mentioned), adopted the following rule of practice:

### "RULE XII.

"In all suits by material-men for supplies, repairs, or other necessaries for a foreign ship, or for a ship in a foreign port, the libellant may proceed against the ship and freight *in rem*, or against the master and owner alone *in personam;* and the like proceeding *in rem* shall apply to cases of domestic ships, where by the local law a lien is given to material-men for supplies, repairs, and other necessaries."

On the 1st of May, 1859, a new twelfth rule was adopted as a substitute for the one above given. It was thus:

### "RULE XII.

"In all suits by material-men, for supplies or repairs, or other necessaries for a foreign ship, or for a ship in a foreign port, the libellant may proceed against the ship or freight *in ˜em*, or against the master or owner alone *in personam*. And the like proceedings *in personam, but not in rem*, shall apply in cases of domestic ships for supplies, repairs, or other necessaries."

---

* Reported under the name of Peyroux *v.* Howard, 7 Peters, 324.

† Acts of May 8th, 1792 (1 Stat. at Large, 275), and of August 23d, 1842 (5 Id. 516).

The reasons for the substitution of this latter rule for the former one are stated by Taney, C. J., in the case of *The Steamer St. Lawrence*,* to have been that in some cases the State laws giving liens, and the constructions put on them by State courts, were found not to harmonize with the principles and rules of the maritime code, and embarrassed the Federal courts in applying them.

In this state of things, William Doyle and another filed a libel in the District Court of the United States for the District of Louisiana, abovementioned, *on the 10th day of June*, 1871, against the steamer Lottawana, of New Orleans, for mariners' wages. The vessel being seized, libels of intervention were afterwards filed by various parties, some for mariners' wages, some for salvage services, some for supplies, materials, and repairs furnished in the port of New Orleans, for the use of the steamer. On the 20th day of June, 1871, Catharine Rodd, administratrix, together with several commercial firms of the city of New Orleans, filed a libel of intervention by which they set up a mortgage on the vessel, given to them by the owner, on the 20th of May, 1871, and duly recorded in the custom-house on the 22d of May, to secure the payment of various promissory notes of the same date, given to said libellants by the said owner, and amounting to more than $14,000.

The steamer, up to the 16th of May, had been engaged in the river trade on the Mississippi and Red Rivers, between New Orleans and Jefferson, in Texas, and was laid up for repairs at New Orleans on that day. Most of the claims for wages and supplies arose before the date of the mortgage, although some arose afterwards. The steamer was sold for $7500, and, after deducting expenses of sale, costs, salvage and wages of mariners (which were admitted to have preference), there remained a surplus of $4644.42, which the District Court, by a decree rendered February 26th, 1872, *and signed on the 1st of March following*, decreed

---

* 1 Black, 529.

to be paid *pro rata* to the mortgage creditors, to the exclusion of the claims for repairs and supplies.

On the 6th of May, 1872, about two months after the decree was finally rendered, this court promulgated yet a third twelfth rule in admiralty. It was in these words:

"In *all* suits by material-men for supplies or repairs or other necessaries, the libellant may proceed against the ship and freight *in rem*, or against the master or owner alone *in personam*."

In this state of things, *on the 3d of June*, 1872, the above-mentioned decree of the District Court was reversed by the Circuit Court, on appeal, and the surplus was decreed to be paid *pro rata* to the claimants for repairs and supplies, to the exclusion of the mortgage creditors; the amount not being sufficient to pay either class of creditors in full. From the latter decree an appeal was taken to this court.

The principal question presented by the appeal, therefore, was whether the furnishing to a vessel on her credit, at her home port, needful repairs and supplies created a maritime lien. If it did, such lien would take precedence of a mortgage given for the payment of money generally, and the decree must be affirmed. If it did not, the decree was to be reversed, unless the appellees could sustain themselves on some other ground.

Such other grounds they asserted existed in what they alleged to be a fact, to wit, that by the law of Louisiana they had a "privilege" for their claims giving them a lien on the vessel and her proceeds, which lien, though not strictly a maritime one, the court was bound to enforce.

[On that part of the subject the case was said by the appellant's counsel to be thus:

The constitution of Louisiana of 1869, ordains:*

"No mortgage or privilege shall hereafter affect third parties, unless recorded in the parish where the property to be affected is situated."

---

* Article 123.

The Revised Civil Code of Louisiana says:

"ARTICLE 3237. The following debts are privileges on the price of ships and other vessels:

" ' Sums due to sellers: to those who have furnished materials, and to workmen employed in the construction, if the vessel has never made a voyage, and those due to creditors for supplies, labor, repairing, victuals, armament, and equipment.'

"ARTICLE 3273. Privileges are valid against third persons from the date of the recording of the act or evidence of indebtedness, as provided by law.

"ARTICLE 3274. No privilege shall have effect against third persons unless recorded, in the manner required by law, in the parish where the property to be affected is situated.

"ARTICLE 3093. If the mortgage or privilege be a notarial or public act, the same shall be recorded. . . . *If the same be not in writing*, the person claiming the mortgage or privilege, his agent, or some person having knowledge of the fact, must make affidavit of all the facts on which it is based, stating the amount and all the necessary facts, which affidavit shall be recorded in the mortgage-book as other acts of mortgage or privilege."]

No record of mortgage was shown in the transcript.

The case was twice argued, once at December Term, 1873, by *Mr. T. J. Semmes, for the appellant, and Messrs. J. A. Grow and L. M. Day, for the appellees; and now, at this term, by Mr. R. Mott, for the appellant, and Mr. J. A. Grow, for the appellees, and by Mr. W. W. Goodrich, in favor of the lien for supplies furnished a vessel in her home port, and by Mr. William Allan Butler and Mr. Andrew Boardman, in opposition to such lien.*

It was thus contended in favor of such lien, or in support of the ruling below :*

I. *As to the principal question.*

*The General Smith* is the case always relied on against the lien.

* With the brief of the appellee was submitted an opinion of Benedict, J., of the New York District, in the case of *The Crescent*, sustaining a lien for materials against a domestic ship. Much of the argument now given is from that document.

1. *That case was wrongly decided.*

In determining a question of admiralty lien, a court of admiralty must resort for the principles upon which to base its conclusion neither to the rules and decisions of courts of common law nor to the statutory regulations of the different States of the United States, but to the general maritime law which, according to the comity of nations, is administered by all courts of admiralty.* Says Marshall, C. J.:

"In admiralty cases the law, admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise."

Says Nelson, J.:

"The admiralty is a maritime court, instituted for the purpose of administering the law of the sea."

In harmony with these authorities, and with the object of the grant of admiralty jurisdiction contained in the Constitution of the United States, and following also the example set by this court,† we turn to the general maritime law for the law of this case. In that ancient body of law there is found imbedded the general rule that necessaries furnished to a ship bind the ship herself as a contracting party. From this rule, as it exists in the general maritime law, a domestic ship is not excepted. Says Benedict: ‡

"The civil law, the general maritime law, and the particular maritime codes, extend this lien or privilege to all ships and vessels, without any distinction between foreign and domestic vessels."

No sound reason exists why our country should depart from this rule of the admiralty. The foundation of the rule lies in the necessities of navigation. These maintain from age to age the same general characteristics. The vicissitudes to which all vessels engaged in navigation are necessarily exposed, compels some method by which the wants

---

* The Patriot, 1 A. M. L., p. 77.
† Norwich Company *v.* Wright, 13 Wallace, 116.
‡ Admiralty, § 272.

of a ship may be promptly supplied. That result has been found to be best obtained by making the whole value of the ship an available security for any debt lawfully contracted to relieve her wants. It is a mistake to suppose that the principal object of the lien of the maritime law is to protect the interest of those dealing with ships. Its real object is to enable the ship in any place and at any time to obtain relief in case of necessity, and thus to get on, to the end that the venture of the merchant be not jeoparded, and that commerce may thrive. The benefit sought to be secured is benefit to the ship, not to the material-man. In the absence of such a rule it is manifest that the material-man could resort to the common-law lien acquired by retaining the possession of the ship, whence disastrous results must often follow. A rule resting upon such ground was of course made applicable to the demand of the material-man, the necessity for whose services is in most cases as cogent as the need of a crew, or a pilot, or a wharf. Therefore, it came to be understood to be general law, that the material-man acquired a lien by the furnishing of necessaries to a ship, whether domestic or foreign. Such was the declaration of the civil law, which in Roman ports furnished the rule as well for the Roman ship as for the ship of the barbarian. Such was the declaration of the maritime codes, and such the rule declared in the ordinance. And when those great systems of law are referred to, the reference is in no proper sense to local law,* but to general law as known throughout the civilized world, including, for a long period, England.

No sufficient reason, then, as we have said, can be given for making domestic vessels an exception to this rule in the United States. Some considerations press strongly the other way. To admit such an exception is to give to the admiralty courts of the United States a law different from the general maritime law, whereas the provision in the Constitution, by virtue of which the admiralty courts were created, was intended to provide courts for the sole purpose of administer-

---

* The Maggie Hammond, 9 Wallace, 452; Dupont v. Vance, 19 Howard, 168; The Seneca, Washington, J., 3d Wallace, Jr.

ing the general maritime law. The maritime law is part of the law of nations, one of the great beauties of which is its universality. Uniformity has been declared to be its essence. The worst maritime code would be one which should be dictated by the separate interest and influenced by the peculiar manner of only one people.

Further. The peculiar character of the commerce which engages the ships and vessels of the United States—there is no such thing as a vessel of a State—affords additional reason why the law respecting supplies to ships and vessels should be uniform throughout the United States, and at the same time in harmony with the general maritime law. For in our country we have great inland seas, bordering on different States of the Union, with different laws, and also on foreign territory, which are navigable by vessels owned by residents of different States, and also by foreign vessels proper. We also have long navigable rivers whose waters are vexed by the keels of foreign as well as domestic vessels, engaged for the most part on routes from State to State, but not infrequently on voyages which extend beyond the mouths of rivers to the open sea, and thence to all the corners of the earth. In such a navigation no harmony in the laws governing the vessel, during the course of a single voyage even, can be secured by resort to State laws or to the decisions of the State tribunals. For such a country, a maritime law—the same in all the States—rendered uniform by the decisions of one high appellate court of admiralty—and in harmony with the general maritime law of the world—a law not rigid by reason of statutory provisions, but broad, flexible, and just—a common law of the seas, becomes of the first importance; and the necessity for such a system of law becomes imperious, when we approach the subject of supplies and repairs, which any vessel, at any moment, and at any place, may be compelled to procure forthwith, or perish where she lies.

That serious difficulty did, not long ago, arise from the want of such a law for the ships and vessels of the United States, is in a great measure owing to the decision that all vessels of the United States are foreign vessels when without

the limits of the State wherein the residence of the owner happens to be.

These views derive support from the well-known fact that the announcement of the doctrine of *The General Smith* was followed by statutes of the States which, as far as it was possible for the States to do, reinstated the rule of the general maritime law. In more than twenty States of the Union a lien upon domestic vessels for repairs and supplies was attempted to be created by local laws; and this, too, with full knowledge that the courts of admiralty could be resorted to for the enforcement of the lien so created, as indeed they were, almost to the exclusion of the State tribunals in some places. The reports of the State of New York prior to the change of the twelfth rule, show but very few adjudications—some ten or twelve perhaps—upon this subject by the State courts, while, as is notorious, the District Court of the United States in the port of New York was crowded with actions by material-men seeking there to secure the benefits of a maritime lien by enforcing the lien law of the State. These statutes, so used in many States, were not only maintained upon the statute-books, but they were from time to time rendered more nearly analogous to the maritime law, until the ship-owning State of New York, by the act of 1862, not only extended a lien to the builders of ships and to stevedores, but in effect created a State admiralty for the plain purpose of securing to the vessels owned by citizens of the State the benefits of the rule of the general maritime law. The absence of any repugnance to the rule of the maritime law is thus clearly shown, and it is believed that no objection exists anywhere to surrendering to the admiralty courts of the United States the whole subject of liens upon domestic vessels.*

2. *Aside from the twelfth rule of 1872, to be spoken of directly, there are decisions of the Supreme Court which, in effect, overthrow the authority of The General Smith.*

* See remarks of New York Court of Appeals, in Brookman *v.* Hamill, 43 New York, 562.

The reason relied on in that case, as the foundation for the distinction between domestic and foreign vessels, was that the law of England recognized such a distinction.[*] It may be remarked in passing that in England the distinction was forced upon the courts of admiralty by the prohibition of the courts of common law, issued upon considerations as to the policy of England, and that it has not been often that the circumstance that a particular rule of law would advance the interests of England, has been held to be a reason for the adoption of the rule by the courts of the United States. Waiving, however, such considerations, we submit that since *The General Smith* this court has on more than one occasion declared that the doctrines of England, in respect to the admiralty, do not furnish authority for the determinations of the admiralty courts of this country.[†] The reason for the decision in the case of *The General Smith* having been thus repudiated by late decisions, the authority of the case is gone.

Further. This court has expressly declared that the grant of the Constitution "must be held to mean all such cases of a maritime character as were cognizable in the admiralty courts of the States at the time the Constitution was adopted."[‡] Now, since the argument of Mr. F. C. Loring, in *Insurance Company* v. *Dunham*,[§] and what he there showed, it is beyond dispute that the admiralty courts of the Colonies did entertain actions to enforce liens for supplies furnished to domestic vessels.

But more than this. In this very case of *The Lottawanna*, and so lately as at the last term,[‖] Clifford, J., delivering the opinion of the court says—and this *without any reference to the new twelfth rule of 1872*—as follows:

"Much embarrassment has existed ever since the old twelfth admiralty rule was repealed, as the new rule makes no pro-

---

[*] See what is said by Woodbury, J., in Waring v. Clark, 5 Howard, 451.

[†] Waring v. Clark, 5 Howard, 451; The Magnolia, 20 Id. 299, 341; The Genesee Chief, 12 Id. 451; The China, 7 Wallace, 69.

[‡] The Belfast, 7 Wallace, 636; Waring v. Clark, 5 Howard, 451.

[§] 11 Wallace, 1.   [‖] 20 Id. 219.

vision to enforce the payment of contracts for repairs and supplies furnished to domestic ships, except by a libel *in personam.* Repeated judicial attempts have been made to overcome the difficulty, none of which have proved satisfactory, because they failed to provide a remedy in the admiralty by a proceeding *in rem.* Inconveniences of the kind have been felt for a long time, until the *bench* and the bar have come to doubt whether the decision that a maritime lien does not arise in a contract for repairs and supplies furnished to a domestic ship is correct, as it is clear that the contract is a maritime contract, just as plainly as the contract to furnish such repairs and supplies to a foreign ship or to a domestic ship in the port of a State other than that to which the ship belongs.* Such a remedy is not given even in the latter case, unless the repairs and supplies were furnished *on the credit of the ship,* and it is difficult to see why the same remedy may not be given in the former case if the repairs and supplies were obtained by the master on the same terms.† These and *many other considerations have had the effect to create serious doubts as to the correctness of the decision made more than fifty years ago, in The General Smith,‡ that a maritime lien does not arise in such a case.*"

3. *The modification in* 1872 *of the twelfth admiralty rule has greatly changed the position of the question.*

Originally the twelfth rule recognized the law declared in the case of *The General Smith.* It was based upon two propositions: 1st. That by the maritime law of the United States no lien upon a domestic vessel existed in favor of a material-man; 2d. That a local law could give the material-man a lien upon a domestic vessel, which might be enforced by the courts of admiralty.

In 1858 the second of these propositions was withdrawn from the rule, and by the amendment of 1872 the first was made to disappear. As the rule now stands, it authorizes a material-man to institute an action *in rem* against a domestic and a foreign ship alike.

---

* Abbott on Shipping, 143, 148.

† 5 American Law Review, 612; 7 Id.; The St. Lawrence, 1 Black, 529; The Harrison, 2 Abbott, United States Reports, 78; The Belfast, 7 Wallace, 645, 646.

‡ 4 Wheaton, 443.

The rule, as thus amended, overrules the decision in the case of *The General Smith*, and is in itself an authoritative declaration that the distinction heretofore made between foreign and domestic ships does not exist. It can hardly be supposed that the Supreme Court intended to declare by rule, that a material-man could proceed against the domestic ship *in rem*, and at the same time leave it open to be decided that such proceeding must of course be futile. Nor can it be supposed that the Supreme Court intended to give by rule a right not before existing by law. Any lien thus created would be a new right arising out of the process, and subject, of course, to all rights previously acquired. Such a lien would be very different indeed from a maritime lien, which does not arise out of the process, but out of the contract. And as by the rule the right is made the same in the case of a foreign as of a domestic vessel, such an understanding of the rule would seem to sweep from the law of the United States the whole doctrine of maritime liens, so far as regards material men. But how can an authorization of a proceeding *in rem* be simply a rule of process, if, as says Curtis, J., "a proceeding *in rem* is to give effect to a maritime lien arising either *ex contractu* or *quasi ex contractu*, or *ex delicto* or *quasi ex delicto ?*"* If "the lien and the proceeding *in rem* are correlative, where one exists the other may be taken."†

II. [As to the special or subsidiary question—that of the privilege under the law of Louisiana—it was argued as the reporter understood it,—notwithstanding what was said in the constitution and code of Louisiana, that *hypothecations of ships and other vessels were made according to the laws and usages of commerce*, and that in whatever cases those usages and laws would recognize the validity of a hypothecation of a vessel, the code of Louisiana also recognized it, and in none other. This special question, however, was less insisted on than the principal one.]

---

* The Mayurka, 2 Curtis, 77.
† The Rock Island Bridge, 6 Wallace, 215.

Mr. Justice BRADLEY delivered the opinion of the court.

The principal questions raised in this case were decided by this court adversely to the lien more than fifty years ago in the case of *The General Smith*, reported in 4 Wheaton, 438, and that decision has ever since been adhered to, except occasionally in some of the District Courts. A solemn judgment relied on so long by the commercial community as a rule of property and the law of the land, ought not to be overruled except for very cogent reasons. If, however, in the progress of investigation, and with the new lights that have been thrown upon the whole subject of maritime law and admiralty jurisdiction, a more rational view of the question demands an adverse ruling in order to preserve harmony and logical consistency in the general system, the court might, perhaps, if no evil consequences of a glaring character were likely to ensue, feel constrained to adopt it. But if no such necessity exists, we ought not to permit any consideration of mere expediency or love of scientific completeness, to draw us into a substantial change of the received law. The additional security which has been extended to bills of sale and mortgages on ships and vessels since the passage of the act for recording them in the custom-house; and the confidence with which purchasers and mortgagees have invested money therein under the existing course of decisions on this subject, have placed a large amount of property at undue hazard, if those decisions may lightly, or without grave cause, be disturbed.

The ground on which we are asked to overrule the judgment in the case of *The General Smith* is, that by the general maritime law, those who furnish necessary materials, repairs, and supplies to a vessel, upon her credit, have a lien on such a vessel therefor, as well when furnished in her home port as when furnished in a foreign port, and that the courts of admiralty are bound to give effect to that lien.

The proposition assumes that the general maritime law governs this case, and is binding on the courts of the United States.

But it is hardly necessary to argue that the maritime law is only so far operative as law in any country as it is adopted by the laws and usages of that country. In this respect it is like international law or the laws of war, which have the effect of law in no country any further than they are accepted and received as such; or, like the case of the civil law, which forms the basis of most European laws, but which has the force of law in each state only so far as it is adopted therein, and with such modifications as are deemed expedient. The adoption of the common law by the several States of this Union also presents an analogous case. It is the basis of all the State laws; but is modified as each sees fit. Perhaps the maritime law is more uniformly followed by commercial nations than the civil and common laws are by those who use them. But, like those laws, however fixed, definite, and beneficial the theoretical code of maritime law may be, it can have only so far the effect of law in any country as it is permitted to have. But the actual maritime law can hardly be said to have a fixed and definite form as to all the subjects which may be embraced within its scope. Whilst it is true that the great mass of maritime law is the same in all commercial countries, yet, in each country, peculiarities exist either as to some of the rules, or in the mode of enforcing them. Especially is this the case on the outside boundaries of the law, where it comes in contact with, or shades off into the local or municipal law of the particular country and affects only its own merchants or people in their relations to each other. Whereas, in matters affecting the stranger or foreigner, the commonly received law of the whole commercial world is more assiduously observed—as, in justice, it should be. No one doubts that every nation may adopt its own maritime code. France may adopt one; England another; the United States a third; still, the convenience of the commercial world, bound together, as it is, by mutual relations of trade and intercourse, demands that, in all essential things wherein those relations bring them in contact, there should be a uniform law founded on natural reason and justice. Hence the adoption

by all commercial nations (our own included) of the general maritime law as the basis and groundwork of all their maritime regulations. But no nation regards itself as precluded from making occasional modifications suited to its locality and the genius of its own people and institutions, especially in matters that are of merely local and municipal consequence and do not affect other nations. It will be found, therefore, that the maritime codes of France, England, Sweden, and other countries, are not one and the same in every particular; but that whilst there is a general correspondence between them arising from the fact that each adopts the essential principles, and the great mass of the general maritime law, as the basis of its system, there are varying shades of difference corresponding to the respective territories, climate, and genius of the people of each country respectively. Each state adopts the maritime law, not as a code having any independent or inherent force, *proprio vigore*, but as its own law, with such modifications and qualifications as it sees fit. Thus adopted and thus qualified in each case, it becomes the maritime law of the particular nation that adopts it. And without such voluntary adoption it would not be law. And thus it happens, that, from the general practice of commercial nations in making the same general law the basis and groundwork of their respective maritime systems, the great mass of maritime law which is thus received by these nations in common, comes to be the common maritime law of the world.

This account of the maritime law, if correct, plainly shows that in particular matters, especially such as approach a merely municipal character, the received maritime law may differ in different countries without affecting the general integrity of the system as a harmonious whole. The government of one country may be willing to give to its citizens, who supply a ship with provisions at her home port where the owner himself resides, a lien on the ship; whilst that of another country may take a contrary view as to the expediency of such a rule. The difference between them in a matter that concerns only their own citizens, in each case,

cannot seriously affect the harmony and consistency of the common maritime law which each adopts and observes.

This view of the subject does not in the slightest degree detract from the proper authority and respect due to that venerable law of the sea, which has been the subject of such high encomiums from the ablest jurists of all countries; it merely places it upon the just and logical grounds upon which it is accepted, and with proper qualifications, received with the binding force of law in all countries.

The proposition, therefore, that by the general maritime law a lien is given in cases of the kind now under consideration, does not advance the argument a single step, unless it be shown to be in accordance with the maritime law as accepted and received in the United States. It certainly has not been the maritime law of England for more than two centuries past; and whether it is the maritime law of this country depends upon questions which are not answered by simply turning to the ordinary European treatises on maritime law, or the codes or ordinances of any particular country.

That we have a maritime law of our own, operative throughout the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend " to all cases of admiralty and maritime jurisdiction." But by what criterion are we to ascertain the precise limits of the law thus adopted? The Constitution does not define it. It does not declare whether it was intended to embrace the entire maritime law as expounded in the treatises, or only the limited and restricted system which was received in England, or lastly, such modification of both of these as was accepted and recognized as law in this country. Nor does the Constitution attempt to draw the boundary line between maritime law and local law; nor does it lay down any criterion for ascertaining that boundary. It assumes that the mean-

ing of the phrase " admiralty and maritime jurisdiction " is well understood.  It treats this matter as it does the cognate ones of common law and equity, when it speaks of " cases in law and equity," or of " suits at common law," without defining those terms, assuming them to be known and understood.

One thing, however, is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country.  It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.

The question is discussed with great felicity and judgment by Chief Justice Taney, delivering the opinion of the court in the case of *The St. Lawrence*,* where he says: "Judicial power, in all cases of admiralty and maritime jurisdiction, is delegated by the Constitution to the Federal government in general terms, and courts of this character had then been established in all commercial and maritime nations, differing, however, materially in different countries in the powers and duties confided to them; the extent of the jurisdiction conferred depending very much upon the character of the government in which they were created; and this circumstance, with the general terms of the grant, rendered it difficult to define the exact limits of its power in the United States.  This difficulty was increased by the complex character of our government, where separate and distinct specified powers of sovereignty are exercised by the United States and a State independently of each other within the same territorial limits.  And the reports of the decisions of the court will show that the subject has often been before it, and carefully considered, without being able to fix with precision its definite boundaries; but certainly no State law can enlarge

* 1 Black, 526, 527.

it, nor can an act of Congress or rule of court make it broader than the judicial power may determine to be its true limits. And this boundary is to be ascertained by a reasonable and just construction of the words used in the Constitution, taken in connection with the whole instrument, and the purposes for which admiralty and maritime jurisdiction was granted to the Federal government."

Guided by these sound principles, this court has felt itself at liberty to recognize the admiralty jurisdiction as extending to localities and subjects which, by the jealousy of the common law, were prohibited to it in England, but which fairly belong to it on every ground of reason when applied to the peculiar circumstances of this country, with its extended territories, its inland seas, and its navigable rivers, especially as the narrow restrictions of the English law had never prevailed on this side of the Atlantic, even in colonial times.

The question as to the true limits of maritime law and admiralty jurisdiction is undoubtedly, as Chief Justice Taney intimates, exclusively a judicial question, and no State law or act of Congress can make it broader, or (it may be added) narrower, than the judicial power may determine those limits to be. But what the law is within those limits, assuming the general maritime law to be the basis of the system, depends on what has been received as law in the maritime usages of this country, and on such legislation as may have been competent to affect it.

To ascertain, therefore, what the maritime law of this country is, it is not enough to read the French, German, Italian, and other foreign works on the subject, or the codes which they have framed; but we must have regard to our own legal history, constitution, legislation, usages, and adjudications as well. The decisions of this court illustrative of these sources, and giving construction to the laws and Constitution are especially to be considered; and when these fail us, we must resort to the principles by which they have been governed.

But we must always remember that the court cannot

make the law, it can only declare it. If, within its proper scope, any change is desired in its rules, other than those of procedure, it must be made by the legislative department. It cannot be supposed that the framers of the Constitution contemplated that the law should forever remain unalterable. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed. The scope of the maritime law, and that of commercial regulation are not coterminous, it is true, but the latter embraces much the largest portion of ground covered by the former. Under it Congress has regulated the registry, enrolment, license, and nationality of ships and vessels; the method of recording bills of sale and mortgages thereon; the rights and duties of seamen; the limitations of the responsibility of shipowners for the negligence and misconduct of their captains and crews; and many other things of a character truly maritime. And with regard to the question now under consideration, namely, the rights of material-men in reference to supplies and repairs furnished to a vessel in her home port, there does not seem to be any great reason to doubt that Congress might adopt a uniform rule for the whole country, though, of course, this will be a matter for consideration should the question ever be directly presented for adjudication.

On this subject the remarks of Mr. Justice Nelson, in delivering the opinion of the court in *White's Bank v. Smith** (which established the validity and effect of the act respecting the recording of mortgages on vessels in the custom-house), are pertinent. He says: "Ships or vessels of the United States are creatures of the legislation of Congress. None can be denominated such, or be entitled to the benefits or privileges thereof, except those registered or enrolled according to the act of September 1st, 1789; and those which, after the last day of March, 1793, shall be registered or enrolled in pursuance of the act of 31st December, 1792, and must be wholly owned by a citizen or citizens of the United

---

* 7 Wallace, 655, 656.

States, and to be commanded by a citizen of the same." ...
" Congress having created, as it were, this species of prop-
erty, and conferred upon it its chief value under the power
given in the Constitution to regulate commerce, we perceive
no reason for entertaining any serious doubt but that this
power may be extended to the security and protection of the
rights and title of all persons dealing therein. The judicial
mind seems to have generally taken this direction." This
case was subsequently affirmed by *Aldrich* v. *Ætna Company.**

Be this, however, as it may, and whether the power of
Congress is or is not sufficient to amend the law on this sub-
ject (if amendment is desirable), this court is bound to de-
clare the law as it now stands. And according to the mari-
time law as accepted and received in this country, we feel
bound to declare that no such lien exists as is claimed by
the appellees in this case. The adjudications in this court
before referred to, which it is unnecessary to review, are
conclusive on the subject; and we see no sufficient ground
for disturbing them.

This disposes of the principal question in the case.

But it is alleged by the appellees that by the law of Lou-
isiana they have a privilege for their claims, giving them a
lien on the vessel and her proceeds; and that the court was
bound to enforce this lien in their behalf, though not strictly
a maritime lien.

On examining the record, however, it appears that the
appellees never caused their lien (if they had one) to be re-
corded according to the requirements of the State law. By
the one hundred and twenty-third article of the constitution
of Louisiana, adopted in 1869, it is declared that no " mort-
gage or privilege shall hereafter affect third parties, unless
recorded in the parish where the property to be affected is
situated." And an act of the legislature, passed since that
time, adopts the very terms of the constitutional provision.
And a further act provides that if the privilege be not in
writing, the facts on which it is based must be stated in an

---

* 8 Wallace, 491.

affidavit, which must be recorded.* None of these requisites having been performed, no lien can be claimed under the State law.

But if there were any doubt on this subject, the case of the appellees is met by another difficulty. The admiralty rule of 1859, which precluded the District Courts from entertaining proceedings *in rem* against domestic ships for supplies, repairs, or other necessaries, was in force until May 6th, 1872, when the new rule was promulgated. Now, this case was commenced in the District Court a year previous to this, and final judgment in the District Court was rendered two months previous. It is true that the judgment of the Circuit Court, on appeal, was not rendered until the 3d day of June, 1872; but if the new rule had at that time been brought to the attention of the court, it could hardly have been applied to the case in its then position. All the proceedings had been based and shaped upon other grounds and theories, and not upon the existence of that rule. It would not have been just to the other parties to apply to them a rule which was not in existence when they were carrying on the litigation.

As to the recent change in the admiralty rule referred to, it is sufficient to say, that it was simply intended to remove all obstructions and embarrassments in the way of instituting proceedings *in rem* in all cases where liens exist by law, and not to create any new lien, which, of course, this court could not do in any event, since a lien is a right of property, and not a mere matter of procedure.

Had the lien been perfected, and had the rule not stood in the way, the principles that have heretofore governed the practice of the District Courts exercising admiralty jurisdiction, and which have been repeatedly sanctioned by this court, would undoubtedly have authorized the material-men to file a libel against the vessel or its proceeds.† It seems

---

* Revised Civil Code, Articles 3273, 3274, 3093.

† The General Smith, 4 Wheaton, 488; Peyroux *v.* Howard, 7 Peters, 324; The Orleans *v.* Phœbus, 11 Id. 175; The St. Lawrence, 1 Black, 522.

to be settled in our jurisprudence that so long as Congress does not interpose to regulate the subject, the rights of material-men furnishing necessaries to a vessel in her home port may be regulated in each State by State legislation. State laws, it is true, cannot exclude the contract for furnishing such necessaries from the domain of admiralty jurisdiction, for it is a maritime contract, and they cannot alter the limits of that jurisdiction; nor can they confer it upon the State courts so as to enable them to proceed *in rem* for the enforcement of liens created by such State laws, for it is exclusively conferred upon the District Courts of the United States. They can only authorize the enforcement thereof by common-law remedies, or such remedies as are equivalent thereto. But the District Courts of the United States having jurisdiction of the contract as a maritime one, may enforce liens given for its security, even when created by the State laws.* The practice may be somewhat anomalous, but it has existed from the origin of the government, and, perhaps, was originally superinduced by the fact that prior to the adoption of the Constitution, liens of this sort created by State laws had been enforced by the State courts of admiralty; and as those courts were immediately succeeded by the District Courts of the United States, and in several instances the judge of the State court was transferred to the District Court, it was natural, in the infancy of Federal legislation on commercial subjects, for the latter courts to entertain jurisdiction over the same classes of cases, in every respect as the State courts had done, without due regard to the new relations which the States had assumed towards the maritime law and admiralty jurisdiction. For example, in 1784, the legislature of Pennsylvania passed a law allowing persons concerned in building, repairing, fitting out, and furnishing vessels for a voyage, to sue in admiralty, as mariners sue for wages. Two cases, those of *The Collier*, and *The Enterprise*, arising under this law, and coming before the admiralty court of Pennsylvania, are reported in

* Cases *supra*.

Judge Hopkinson's works.* No doubt other cases of the same kind occurred in the courts of other States.

But, whatever may have been the origin of the practice, and whether or not it was based on the soundest principles, it became firmly settled, and it is now too late to question its validity.

It is true that the inconveniences arising from the often intricate and conflicting State laws creating such liens, induced this court in December Term, 1858, to abrogate that portion of the twelfth admiralty rule of 1844 which allowed proceedings *in rem* against domestic ships for repairs and supplies furnished in the home port, and to allow proceedings *in personam* only in such cases. But we have now restored the rule of 1844, or, rather, we have made it general in its terms, giving to material-men in all cases their option to proceed either *in rem* or *in personam*. Of course this modification of the rule cannot avail where no lien exists; but where one does exist, no matter by what law, it removes all obstacles to a proceeding *in rem*, if credit is given to the vessel.

It would undoubtedly be far more satisfactory to have a uniform law regulating such liens, but until such a law be adopted (supposing Congress to have the power) the authority of the States to legislate on the subject seems to be conceded by the uniform course of decisions.

Indeed, there is quite an extensive field of border legislation on commercial subjects (generally local in character) which may be regulated by State laws until Congress interposes, and thereby excludes further State legislation. Pilotage is one of the subjects in this category. So far as Congress has interposed, its authority is supreme and exclusive; but where it has not done so, the matter is still left to the regulation of State laws. And yet this exercise by the States of the power to regulate pilotage has not withdrawn the subject, and, indeed, cannot withdraw it from the admi-

---

* Volume 3, pp. 131, 171.

ralty jurisdiction of the District Courts.* And, of course, as before intimated, this jurisdiction of the State legislatures in such cases is subject to be terminated at any time by Congress assuming the control. In some cases this is not so desirable as in others, but in the one under consideration, if Congress has the power to intervene, it is greatly to be desired that it should do so. It would be better to have the subject regulated by the general maritime law of the country than by differing State laws. The evils arising from conflicting lien laws passed by the several States are forcibly set forth by Chief Justice Taney in the case of *The St. Lawrence*, before cited. It may be added that the existence of secret liens is not in accord with the spirit of our commercial usages, and a uniform law by which the liens in question should be required within a reasonable time to be placed on record in the custom-house like mortgages, and otherwise properly regulated, would be of great advantage to the business community.

But there is another mode in which the appellees, if they had a valid lien, could come into the District Court and claim the benefit thereof, namely, by a petition for the application of the surplus proceeds of the vessel to the payment of their debts, under the forty-third admiralty rule. The court has power to distribute surplus proceeds to all those who can show a vested interest therein, in the order of their several priorities, no matter how their claims originated.† The propriety of such a distribution in the admiralty has been questioned on the ground that the court would thereby draw to itself equity jurisdiction.‡ But it is a wholesome jurisdiction very commonly exercised by nearly all superior courts, to distribute a fund rightfully in its possession to those who are legally entitled to it; and there is no sound reason why admiralty courts should not do the

---

* Cooley *v.* Port Wardens, 12 Howard, 299; Ex parte McNiel, 13 Wallace, 236.

† Schuchardt *v.* Babbidge, 19 Howard, 239.

‡ The Neptune, 3 Knapp's Privy Council, 111.

same. If a case should be so complicated as to require the interposition of a court of equity, the District Court could refuse to act, and refer the parties to a more competent tribunal.*

In this case the appellants themselves have no maritime lien, but merely a mortgage to secure an ordinary debt not founded on a maritime contract. They, therefore, have no standing in court, except under the forty-third admiralty rule, and in the manner above indicated. Their libel was inadmissible, even under the admiralty rule as recently modified.† But before the final decree they filed a petition for the surplus proceeds, and, as there is no question in the case about fraudulent preference under the Bankrupt law, they are entitled to those proceeds towards satisfaction of their mortgage.

Decree reversed, and the record remanded, with instructions to enter a decree in favor of the appellants,

In conformity with this opinion.

Mr. Justice CLIFFORD, dissenting:

Controversy, sometimes of an imbittered character, existed in the courts of the parent country respecting the jurisdiction of the admiralty court for a century before the American Colonies separated from that country and proclaimed their independence. Differences of opinion also have existed here as to the proper extent of that jurisdiction ever since the adoption of the Federal Constitution, as evidenced by the decisions of the Supreme Court at different periods in our judicial history.

Attempt was made at an early period to limit the jurisdiction of the admiralty courts to tide-waters, and to exclude its exercise altogether from waters within the body of a county, whether the waters were or were not affected by the ebb and flow of the tide. Express decision to the effect that the admiralty had no jurisdiction, even in a suit for

* See cases reviewed in 1 Conklin's Admiralty, pp. 48–66, 2d ed.
† The John Jay, 17 Howard, 399.

seamen's wages, was made in the case of *The Jefferson*,* except in cases where the service is substantially performed upon the sea or upon waters within the ebb and flow of the tide.

Jurisdiction of the admiralty courts at that period in the parent country did not extend to any case where the common-law courts could give the parties a remedy in a trial by jury, and the theory here for a long time was that the clause of the ninth section of the Judiciary Act which saves to suitors the right to a common-law remedy, where the common law is competent to give it, excluded all cases from the jurisdiction of the admiralty courts if the cause of action arose or accrued *infra corpus comitatus.* Protracted acquiescence in that theory gave it for a time the force of law, until the question was presented directly to the Supreme Court, when the whole theory was completely overturned in all cases where the cause of action, whether tort or contract, had respect to acts done or service performed upon tidewaters.†

Doubts of a perplexing character arose in some of the circuits whether affreightment contracts were cognizable in the admiralty, which ultimately culminated in an absolute denial of the jurisdiction in all such cases. Wide differences of opinion upon the subject existed, and in order to its final settlement the question was presented to the Supreme Court in its whole length and breadth.‡

Nothing was left undone in that case, on either side, which could be accomplished by a skilful argument and indefatigable research. Two of the propositions, one selected from each side, will serve to illustrate the nature of the contention and the wide range of the discussion. By the appellants it was insisted that the District Courts had no jurisdiction over such a contract, because it was made on land, within the body of a county, for the transportation of goods

---

* 10 Wheaton, 428.

† Waring *v.* Clarke, 5 Howard, 452.

‡ The Lexington, 6 Id. 392.

in a described route over inland waters landlocked the whole way, and because the contemplated voyage terminated *infra fauces terræ.* Opposed to that, the appellees contended that in all cases of contract the question is whether the contract or service to be performed is in its nature maritime, and that in all cases of maritime contract the proceeding may be *in rem* or *in personam*, at the option of the libellant. Elaborate discussion followed, but the Supreme Court silenced forever all well-founded doubts upon that subject.

Such jurisdiction, however, was in the united view of the Supreme Court at that time, limited to tide-waters; nor did either of the learned justices who delivered the opinions of the court in those cases even intimate that the court could entertain appellate jurisdiction in such a case if the cause of action consisted of acts done or service performed on waters not affected by the ebb and flow of the tide.

Admiralty jurisdiction, by virtue of those decisions, continued in our jurisprudence to be limited to the ebb and flow of the tide for more than a quarter of a century, in spite of the deepseated dissatisfaction which existed in all parts of the country interested in Western commerce or in the navigation of the great lakes and rivers of that portion of the Union.

Subsequent attempt was made by Congress to furnish a remedy for the difficulty, which was by no means satisfactory, and expedients to obviate the embarrassment were also attempted by the courts, all of which were equally unsuccessful, until the Supreme Court was brought face to face with the question whether the rule of decision that the jurisdiction of the admiralty was limited to the ebb and flow of the tide could be upheld as a correct exposition of that clause of the Constitution which provides that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction.

Opposition to change induced the cry of *stare decisis*, just as when the argument was presented that the admiralty jurisdiction followed the tide even within the body of a county. Such a cry proved to be insufficient to restrain the advance

of admiralty jurisdiction or to prevent it from entering even into the acknowledged limits of States having tide-waters within their borders, and it was again destined to a still greater defeat when it was invoked as the means of perpetuating the great error that the admiralty jurisdiction did not extend to the great lakes and fresh-water rivers of our country.

Public duty required the court to review the former case, and the great magistrate presiding over the court did not hesitate to reverse the rule of decision there established and to determine to the effect that the admiralty jurisdiction is not limited to tide-waters, and that it extended to all public lakes and rivers used for the purpose of commerce and navigation between the States or for foreign trade.*

Strenuous effort was subsequently made to induce the court to qualify the rule there laid down, or to restrict its application so that the jurisdiction of the admiralty courts should not extend to acts done or service performed within the body of a county, if the waters were above the flux and reflux of the tide, but this court refused to adopt any such qualification, and reaffirmed, in the most authoritative manner, the rule previously announced in the two leading cases upon those subjects.†

Unquestionably, the jurisdiction of the admiralty is, by those cases, made to depend upon the navigable character of the water, and not upon the ebb and flow of the tide; and the court say, in the case last cited, if the water is navigable it is deemed to be public, and if public it is regarded as within the legitimate scope of the admiralty jurisdiction of the Constitution.

Except for one or two expressions contained in the opinion of the Chief Justice, which are much intensified in the head-note of the case, and which are repeated in the opinion in the case of *The Magnolia*, those two decisions would, in

---

\* The Genesee Chief, 12 Howard, 454.

† The Magnolia, 20 Howard, 298; Waring v. Clarke, 5 Id. 452; The Genesee Chief, 12 Id. 454.

all probability, have settled the general question of admiralty jurisdiction under the Constitution, free from several perplexing embarrassments which presented themselves in subsequent litigations. Considerable weight is given in those opinions to the circumstance that the great lakes and fresh-water rivers are the theatre of extended commerce between different States and with foreign nations, and this court subsequently fell into the error that the admiralty jurisdiction of the District Courts was limited by the commercial power of the Constitution, and decided in two cases that an affreightment contract for the transportation of goods from one port in a State to another port in the same State, or that a contract for necessary repairs and supplies furnished to a vessel in such a trade, is not within the admiralty jurisdiction of the Federal courts.*

Such an error was too palpable not to attract the attention of the court as soon as a case was presented involving the same question, and two or three years later, such a question was presented in the form of a libel for a collision, and the court unanimously decided that the admiralty jurisdiction was conferred by the Constitution; that in cases of tort the question is wholly unaffected by the consideration that the ship was not engaged in foreign commerce or in commerce between the States; that the jurisdiction, whether the cause of action is contract or tort, does not depend on the regulations of commerce; that the two matters of jurisdiction are entirely distinct things, and that they were conferred by separate and distinct grants; that locality is the test of jurisdiction in cases of tort, and that, consequently, if the wrongful act is done on navigable waters, the case is one properly cognizable in the admiralty courts. †

Attention was again called to those two cases in an affreightment suit, when they were both distinctly overruled without hesitation, and the whole court decided that contracts, claims, or service purely maritime and touching

* Allen v. Newbury, 21 Howard, 245; Maguire v. Card, Ib. 250.
† The Commerce, 1 Black, 578.

rights and duties appertaining to commerce and navigation, are of admiralty cognizance and properly cognizable in the District Courts.*

Pending these difficulties and before the Supreme Court decided that the Judiciary Act extended the admiralty jurisdiction over all our navigable waters, the restriction that it did not extend to voyages from a port in one State to another port in the same State had become incorporated into the act of Congress passed professedly to extend such jurisdiction to the great lakes and the rivers connected with the same; but the Supreme Court, in view of the constant and perplexing embarrassment growing out of that restriction, did not hesitate to decide that the act of Congress in that regard had become obsolete and inoperative, and that the admiralty jurisdiction created by the Constitution and conferred by the Judiciary Act was the same everywhere within the United States, and that every distinction between tide-waters and other navigable waters was in that regard obliterated and overruled.†

Erroneous theories also became prevalent in certain quarters in respect to the true nature of the liability of the owners of ships and vessels for necessary repairs and supplies furnished to the master on the credit of the ship, that the burden of proof was in all cases upon the merchant to show both that the ship needed such necessaries and that the master was justified in resorting to the credit of the vessel. Decrees to that effect were rendered in the Circuit Courts, but on appeal to this court the error was corrected and the true rule applied in the case.‡

Where it appears that the repairs and supplies are *necessary* to enable the ship to proceed on her voyage the presumption is, if they are furnished in good faith, that the ship as well as the master and owner is responsible to those who supplied such necessaries, unless it appears that the master had funds which he ought to have applied to those

---

* The Belfast, 7 Wallace, 637.      † The Eagle, 8 Id. 20.
‡ The Lulu, 10 Id. 197; The Grapeshot, 9 Id. 129.

objects, and that the furnishers knew or ought to have known those facts.*

Sufficient has been remarked to show that the several decisions referred to had the effect to remove every stumbling-block in the way of the full legitimate exercise of admiralty jurisdiction except two—the one arising from the long acquiescence of the legal profession in the opinion that the admiralty courts could not take cognizance of suits founded upon marine policies of insurance, and the other growing out of an early decision of this court which it is supposed prohibits the admiralty courts from taking jurisdiction of a libel *in rem* filed by a material-man to enforce a contract for necessary repairs and supplies furnished to a ship in her home port.

Happily the first of the two obstructions mentioned is removed by a more recent decision of this court, and it is much to be regretted that the majority of this court have decided not to remove the other until they " have " a more " convenient season " to accomplish that great purpose.†

Promptitude in correcting such an error, when it is discovered, is very desirable, as the longer it is suffered to prevail the greater is the danger that the correction will impair vested rights. Justice is slow but sure, and it is not doubted that sooner or later the correction will come, as the rule of decision which prohibits the exercise of jurisdiction in such a case is manifestly founded in mistake.

Enough of the facts of the case appear in the statement of them already given,‡ without reproducing the details of the evidence. Suffice it to say that the controversy has respect to the balance of a fund in the registry of the District Court, derived from the sale of a steamer seized and sold for the payment of seamen's wages. Both parties in this court were intervenors in the District Court. Appellants claim what remains of the proceeds of the sale as mortgagees by virtue of a mortgage of the steamer executed to

---

\* The Kalorama, 10 Id. 205; The Custer, Ib. 215.

† Insurance Company *v.* Dunham, 11 Wallace, 21.

‡ *Supra,* pp. 561–563.—REP.

them by the owner.   On the other hand the appellees make claim to the same by virtue of the lien which they insist they have for repairs and necessary supplies furnished to the master on the credit of the vessel.   Proofs were taken and the parties heard, and the District Court ultimately determined that the mortgagees were entitled to the balance of the fund.   Due appeal was taken by the intervenors who furnished the repairs and supplies, to the Circuit Court, where the parties were again heard, and the Circuit Court reversed the decree of the District Court and entered a decree in favor of the intervenors who furnished the repairs and supplies.   Prompt appeal was taken by the intervening mortgagees to this court from that decree.

Two errors are assigned, in substance and effect as follows: (1) That the Circuit Court erred in giving effect to the new twelfth admiralty rule, which had not been adopted when the libels of intervention were filed.   (2) That the Circuit Court erred in awarding the fund to the materialmen, as it is not shown that such creditors have any privilege by the laws of the State.

Contracts or claims for service or damage purely maritime and touching rights and duties appertaining to commerce and navigation are cognizable in the admiralty.   Whenever a maritime lien arises in such a contract or claim, as in controversies respecting repairs made or supplies furnished to a ship, or in case of collision, the libellant may pursue his remedy, whether it be for a breach of a maritime contract or for a marine tort, by a suit *in rem* against the vessel, or by a suit *in personam* against the master and owner in cases where they are jointly liable for the alleged default.   By the civil law a lien upon the ship is given, without any express contract, to those who repair the vessel or furnish her with necessary supplies, whether the vessel was at her *home port* or abroad when the repairs and supplies were made and furnished.*

---

* Williams & Bruce's Practice, 154; The John, 3 Robinson's Admiralty, 288; Hosmer v. Bell, 7 Moore's Privy Council, 24; 3 Kent, 12th ed. 168; 3 Id. 169, note *a*.

Every man, says Abbott,[*] who had repaired or fitted out a ship, or lent money to be employed in those services, had by the law of Rome, and still possesses in those nations which have adopted the civil law as the basis of their jurisprudence, a privilege or right of payment in preference to other creditors upon the value of the ship itself without any instrument of hypothecation, or any express contract, or agreement, subjecting the ship to such a claim. "*Qui in navem exstruendam vel instruendam credidit vel etiam emendam privilegium habet.*"[†] "*Quod quis navis fabricandæ vel emendæ, vel armendæ, vel instruendæ causa, vel quoquo modo crediderit vel ob navem venditam petat, habet privilegium post fiscum.*"[‡] Wherever a maritime lien exists, it gives a claim upon the ship a *jus ad rem* to be carried into effect by legal process, and the claim travels with the ship into whosesoever possession she may come, and is enforced in the court of admiralty by a proceeding *in rem*.[§]

Beyond all doubt such is the rule of the civil law, but the only lien recognized by the common law in such cases, independent of statutory regulations, is the possessory lien which arises out of, and is dependent upon, the possession of the ship, as in cases where goods are delivered to an artisan or tradesman to be manufactured or repaired. Such a lien, as understood at common law, did not attach unless the ship was in the possession of the person who set up the claim, and the extent of the privilege which it conferred was that he might retain the ship in his possession until he was paid the money due him for the repairs made or the supplies furnished.

Undisputed matters need not be discussed, consequently it may be assumed that a contract for necessary repairs or supplies is a maritime contract, whether the vessel was at

---

[*] On Shipping, 142.                    [†] Digest, L. 42, Tit. 5, 1. 26.

[‡] Id L 42, Tit. 5, 1. 34; Code du Commerce, Art. 197; French Code, Liv. 1, Tit. 12, Art 3; The Harrison, 2 Abbot's United States Reports, 74; Ex parte Kirkland, 12 American Law Register, New Series, 801; The Nestor, 1 Sumner, 79.

[§] Addison on Contracts (6th ed.), 273; 1 Wynn's Life of Leoline Jenkins, 76 to 99.

home or abroad when the repairs and supplies were made and furnished; and it may also be assumed that neither a contract for building a ship nor to furnish the materials for the construction of the same is a maritime contract, because such contracts are not directly connected with maritime commerce. They are contracts made on land and are to be performed on land. Contractors of the kind collect their materials very largely from the forests and the mines, and until the ship is launched there is no necessary connection between the subject-matter of the contract and her subsequent employment as a vehicle of commerce and navigation.*

Repairs and supplies were furnished by the intervening appellees to the steamer in her home port, and they claim that they have a lien upon the balance of the fund in the registry of the court for the payment of their demand, which is resisted by the appellants chiefly upon two grounds: (1) They deny that any maritime lien arises in such a case. (2) Because, as they contend, they, the appellants, have a superior claim to what remains of the fund by virtue of the mortgage of the steamer executed to them by the owner.

Support to the first proposition is chiefly drawn from a decision of this court, which it is supposed establishes that rule of decision.† Claims of the kind, the court admit, in that case, give rise to a maritime lien where the repairs or supplies are furnished to a foreign ship or to a ship in a port of a State to which the ship does not belong, and that the general maritime law, following the civil law, gives the party a lien on the ship itself for his security, and that he may well maintain a suit *in rem* in the admiralty to enforce his right. All the authorities, ancient and modern, admit that proposition, but the court proceed to say that, in respect to repairs and necessaries in the port or State to which the ship belongs, the case is governed altogether by the mu-

---

* The Jefferson, 20 Howard, 400; Roach *v.* Chapman, 22 Id. 129; Morewood *v.* Enequist, 23 Id. 494; Young *v.* Ship Orpheus, 2 Clifford, 36; Edwards *v.* Elliott, *supra*, p. 553.

† The General Smith, 4 Wheaton, 443.

nicipal law of that State, and that no lien is implied *unless it is recognized by that law.* Taken as a whole the opinion in that case is more unsatisfactory than any one ever given in a commercial case by that learned judge. It is unaccountable, says a distinguished jurist, that Judge Story, in delivering the opinion of the court on a question so interesting and pregnant, should have done so little. He gives but one page to the entire opinion, cites no authorities, and treats the subject in a slight and unsatisfactory manner.* Other judges have attempted to give the reason for the distinction set up in that case between the remedy given to a party who furnishes necessary repairs and supplies to a ship in the port of a State other than that to which she belongs and the remedy given to the party who furnishes like necessaries to a domestic ship. Those reasons are frankly stated by the late Chief Justice Taney in endeavoring to vindicate the action of the court in denying the process *in rem* to a party who had furnished such necessaries to a domestic ship in a State where the State law made such claims a lien upon the vessel. His view is that the Supreme Court, being invested with the power to make rules, may in its discretion grant or withhold the right to use the process *in rem* as may seem best suited to promote the ends of justice in such controversies; that the process *in rem* is granted to the party furnishing necessaries to a foreign ship or a ship in the port of a State to which she does not belong because "the supplies," in such a case, " are presumed to be furnished on the credit of the vessel," and that the process *in rem* is denied to the party who furnishes such necessaries to the domestic ship because it is presumed that they were "furnished on the personal credit of the owner or master."†

Sometimes it is said that the process is granted in the former case because the presumption is that the owner is absent, and that it is denied in the latter case because the presumption is that the owner is present, which is but another mode of stating the same rule of decision. Unless

---

* 7 American Law Review, 2.     † The St. Lawrence, 1 Black, 527.

the credit is given to the ship the true rule is that there is no maritime lien in either case, and if the credit is given to the ship, reason and sound policy dictate that the party furnishing the necessary repairs and supplies to the domestic ship should be allowed to proceed against the ship as well as the party who afforded similar relief to the foreign ship or to the ship of a State to which she did not belong.

Examples almost without number may be given to illustrate the impolicy, injustice, and absurdity of a rule of decision founded on such a distinction. Suppose a vessel, whose home port is York, Maine, all of whose owners except one reside in Portsmouth, N. H., nine miles distant. Well manned and equipped the vessel starts on a voyage for St. Johns, but meeting with rough weather and receiving damage she puts into Eastport, four hundred miles distant from her home port, for repairs and supplies. Material-men there, under the supposed rule of decision, would have no maritime lien upon the ship, and the master being unknown there and without credit the necessary repairs and supplies could not be procured, although the presumption of law is that the owners in such a case are present, because the port of Eastport is in the State to which the ship belongs. Unable to find relief there for the want of credit, the ship being only crippled and not entirely disabled, may possibly be able to return, and suppose the master decides to make the attempt, and that the ship arrives in safety off the port of Portsmouth, and puts in there for the relief she vainly sought in her first port of refuge, it may now be assumed that she will meet with no difficulty at that port in obtaining credit, as the material-men there will have a lien upon the ship, because the legal presumption is that the owners are absent, though they all reside there except one, whose residence is only nine miles distant.

Apply these suggestions to the different localities of navigation, and it will be easy to see that such rules of decision must lead to unparalleled mischiefs and perplexities. Commerce requires more sensible rules of decision, and those whose interests are embarked in such perilous pursuits are

entitled to better protection than such rules of decision afford.

Executory contracts for repairs and supplies to a domestic ship it is admitted, are as much within the jurisdiction of the admiralty court as one for similar necessaries furnished to a foreign ship or to the ship of a State other than that to which the ship belongs, but the argument of the opinion under consideration is that the party in the case of the domestic ship must seek his remedy against the person and not against the vessel. What Judge Story's reasons were for his conclusion does not appear, as he gave none, but it is safe to conclude, in the absence of such, that the best which exist are those given by the organ of the court in the case last cited.* He expressly conceded that the contract was a maritime contract, and placed the vindication of the prior decision upon the ground that the process *in rem* given for repairs and supplies to a domestic vessel by the court of admiralty, in those countries where the principles of the civil law prevail, is no part of the general maritime code, and he insists that it is obvious that the court in the prior case based the decision upon the ground that the laws of those countries are local laws. Here, then, all interested in the question may see the fatal error pervading those decisions, which is, that the rule of decision embodied in the several maritime codes are mere local laws, each of the particular country where the code was framed and ordained.

Unless the principles embodied in the ordinances, treatises, sea laws, digests, and codes adopted by the countries where the civil law prevails, constitute, to the extent that they concur in the rule of decision, the general maritime code as known in judicial investigation, it is difficult even to imagine what does, as it is known to every legal reader of judicial history that those countries never convened, as in a congress of nations, and ordained a system of maritime regulations which can properly be regarded as the standard authority upon that subject.

* The St. Lawrence, 1 Black, 529.

Such a maritime code as that referred to, in that opinion, does not exist; and if not, and all the codes of the respective countries which adopt the civil law are to be regarded as mere local laws, the inquiry arises, from what source came the rule of decision that the District Courts as courts of admiralty have jurisdiction over contracts for repairs and supplies furnished to a foreign ship or to the ship of a State to which the ship does not belong, or over contracts of affreightment. Certainly the rule of decision was not derived from the jurisprudence of the parent country as administered at the period of the Revolution, as the prohibition of the common-law courts had, long before that event, compelled the admiralty to relinquish all claim to the exercise of such jurisdiction.

Support to such a claim of jurisdiction could not be drawn from that source, and if not, and the civil-law codes are to be regarded as mere local laws, it is impossible to see, if the views of the appellants are correct, that the admiralty has no jurisdiction over contracts for repairs and supplies to domestic ships, from what source the rule of decision was derived that the words "all cases of admiralty and maritime jurisdiction" include jurisdiction over contracts for repairs and supplies even to a foreign ship or to the ship of a State to which the ship does not belong, as no such jurisdiction was exercised by the admiralty court of the parent country at the time of the separation.

Two suggestions may be made in response to that argument:

1. That the words of the Constitution may refer to the admiralty jurisdiction of the parent country before it had been narrowed by the unfriendly prohibitions of the common-law courts.

Admit that, but then it follows beyond peradventure that the same rule of decision which construes the words of the Constitution conferring admiralty power as including jurisdiction over contracts for repairs and supplies to foreign ships, must lead to the same conclusion in respect to contracts and supplies furnished to domestic ships, as the an-

cient jurisdiction of the admiralty courts of the parent country extended to such contracts, whether the repairs and supplies were furnished to foreign or domestic ships. By the civil law every one who repaired or supplied a ship had a privilege or lien upon the ship herself for the amount of the debt thus contracted, and for centuries the admiralty courts of that country exercised such jurisdiction, in respect to which the best text-writers say that the lien or privilege extended to all ships and vessels, without any distinction between foreign and domestic ships.*

Indeed, it is not easy to see, says Benedict, how any difference can exist in principle; if one is a ship or vessel, so is the other; if one is a maritime contract, so must be the other; and the same law and the same reason which give the rule in the one case give it in the other. In both it is for service, labor, materials, and supplies furnished, which, when used for the purpose, become a part of the vessel, and a lien attaches to her because the repairs and supplies were for her benefit, which is just as true of a domestic ship as of a foreign ship.†

By the civil law and the general maritime law, says Parsons, the lien or privilege extends to all ships, without any distinction between foreign and domestic vessels; and he asserts that the admiralty courts of the parent country exercised that jurisdiction until they were compelled to abandon it by the prohibitions of the common-law courts, for which there is the highest authority.

Furnishers of repairs and supplies, says Lord Stowell, in most of the countries governed by the civil law, have a lien on the ship itself, and in our country the same doctrine had for a long time been held by the maritime courts, but after a long contest it was finally overthrown by the courts of common law and by the highest judicatory of the country.‡

Argument to show that a contract to furnish repairs and

---

* The Nestor, 1 Sumner, 79; 2 Parsons on Contracts, 6th ed. 260.

† Benedict (2d ed.), § 272; 2 Parsons on Shipping, 322.

‡ The Zodiac, 1 Haggard's Admiralty, 325; Rich v. Coe, 2 Cowper, 639; Farmer v. Davies, 1 Term, 109.

supplies, whether to a domestic or foreign ship, is a maritime contract, is hardly necessary, as there is not a well-considered decision to the contrary in our language, and the twelfth admiralty rule, throughout all its mutations, from the time it was first adopted to the present time, has always given the District Courts jurisdiction over such contracts either *in rem* or *in personam*. Both the enemies and the friends of the admiralty have always concurred in that proposition, which leaves nothing in controversy in this case except the question whether a maritime lien arises where the contract is to furnish repairs and supplies for a domestic ship, as it must be conceded that wherever there is a maritime lien it may be enforced in the admiralty.

Maritime liens differ from common-law liens in important particulars, as common-law liens are always connected with the possession of the thing and are lost when the possession is relinquished. On the other hand a maritime lien does not in any manner depend upon the possession, as it is a right affecting the thing itself, which gives a proprietary interest in it and a right to proceed against it to recover that interest. Jurisdiction exists in the admiralty in all such cases, and the rule is that wherever there is a maritime lien upon the property it adheres to the proceeds in case of sale and follows the same into whose hands soever they may go, and the proceeds under such circumstances may be attached in the admiralty. Jurists and civil-law writers frequently call it a privilege, and it is well settled that the proceeding *in rem* in the admiralty is the only proper process to enforce such an interest.

Usually a maritime lien is the proper foundation of a proceeding *in rem*, as such process is seldom or never appropriate for any purpose except to enforce the inchoate interest created by such a lien, and the law appears to be well settled that where a proceeding *in rem* is the proper pleading there a maritime lien exists in the thing which it is the office of such a process or pleading to perfect.*

---

* Harmer *v.* Bell, 7 Moore's Privy Council, 284; The Rock Island Bridge, 6 Wallace, 215.

Successful contradiction of the proposition that the party furnishing repairs and supplies to a domestic ship, as well as he who furnished such repairs and supplies to a foreign ship, had a lien upon the ship by the ancient admiralty law of the parent country cannot be made, as the judicial history of that country is full of evidence to establish the affirmative of the proposition in its full length and breadth.\* Admitted or not, the proposition is established, and it would seem to follow that if it was that practice which led the Supreme Court to the conclusion that the words " all cases of admiralty and maritime jurisdiction" must include contracts for repairs and supplies furnished to foreign ships, that ·the same practice should induce the court to hold that the same words also include repairs and supplies furnished to domestic ships, inasmuch as that ruling will correspond as well with the civil law and the general maritime law, as with the ancient practice of the admiralty court of the parent country.

2. All agree that the framers of the Constitution, when they employed the words " all cases of admiralty and maritime jurisdiction" must have had in view some system of maritime jurisprudence, and those who deny that the reference was to the general maritime regulations of the commercial world usually insist, either that the reference was to the English system as known at the date of the Revolution, or to the system and practice known in the States prior to the adoption of the Federal Constitution.

Much discussion at this day to refute the theory that it was the crippled and servile system of the parent country as it existed at the dawn of our independence is quite unnecessary, as the reports of the decisions of the Supreme Court are interspersed throughout with cases in which that theory is denied and overruled. None, it is believed, will

---

\* The Neptune, 3 Haggard, 142; 2 Life of Jenkins, 746; 1 Parsons's Maritime Law, 490; Hoar v. Clement, 2 Shower, 338; Justin v. Ballam, 1 Salkeld, 34; Watkinson v. Bernardiston, 2 Peere Williams, 367; Wilkins v. Carmichael, 1 Douglas, 105; Ex parte Shank, 1 Atkyns, 234; 1 Parsons on Shipping, 322.

now deny that the better source of reference in expounding that part of the Constitution, in order to ascertain the extent and boundaries of the admiralty jurisdiction, is to the system and practice in that regard of the admiralty courts during colonial times and before the Federal Constitution was ratified.

Still the same conclusion must follow as if the question was tested by the system and practice of the admiralty courts of the parent country as it existed before the essential features of that system were annulled and overthrown by the prohibitions of the courts of common law, for the reason that the history of that period shows to a demonstration that the admiralty courts, organized in the Colonies prior to the Revolution, claimed and exercised such jurisdiction over contracts for repairs and supplies furnished to domestic ships as well as over contracts to furnish such necessaries to foreign ships.

Matters of admiralty cognizance were, in most cases, reserved to the crown in the colonial charters, but the first charter granted to the colony of Massachusetts Bay contained no such reservation. Consequently jurisdiction of such matters was exercised in that colony under that charter by a Court of Assistants organized by the colony, whose powers and functions were prescribed and regulated by a colonial ordinance, the last article of which ordained that " all cases of admiralty shall be heard and determined by the Court of Assistants without a jury, unless the court shall see cause to the contrary, provided always that this act shall not be interpreted to obstruct the just plea of any mariner or merchant, impleading any person in any other court upon any matter or cause that depends upon contract, covenant, or other matter of common equity in maritime affairs."*

Without any explanation it is apparent from the words of the ordinance that it vests in the court thereby created full jurisdiction over all maritime cases of contract, covenant, or other matters of equity, reserving to the suitor the right to

---

* Ancient Charters, App., p. 716.

choose a common-law remedy in cases where the common law is competent to give it.  Eighteen years later the charter was granted to the province of Massachusetts Bay, and by that charter all such jurisdiction, power, and authority were reserved to the crown, to be exercised by virtue of commissions issued under the great seal. · Commissions of the kind issued to the judges of the provincial admiralty courts have been published, and they prove that those courts were vested with jurisdiction over all maritime causes and cases in the most unqualified terms.*

Two volumes of the proceedings of those courts in colonial times have recently been found among the papers of a registrar of the court and deposited in a public library in the city of Boston, which are full of instruction on the subject.   Libels for contribution are there found both *in rem* and *in personam*, and libels on charter-parties and on contracts of affreightment, and libels by material-men, both *in rem* and *in personam*, for repairs and supplies furnished in the home port, showing conclusively that the jurisdiction of those courts extended to all cases of admiralty and maritime jurisdiction as understood for centuries in the parent country until the power of the admiralty court was paralyzed by the prohibitions of the courts of common law.†

Throughout many years of our judicial history it was a vexed question whether the District Courts could exercise jurisdiction in cases founded upon marine policies of insurance, and all agree that the discovery of those volumes containing the proceedings of the colonial admiralty courts contributed very much to the true solution of that question. Authentic proof is there exhibited that the colonial admiralty courts exercised jurisdiction in such cases, and the proof is equally full and undeniable that those courts also exercised jurisdiction *in rem* in favor of material-men to enforce the payment of their claims for repairs and supplies furnished to domestic ships.

---

\* Benedict's Admiralty, 2d ed., § 151; Stokes's Colonial History, 166; Waring *v.* Clarke, 5 Howard, 454; Insurance Co. *v.* Dunham, 11 Wallace, 10.
 † Insurance Co. *v.* Dunham, 11 Wallace, 10.

Creditors of the kind have suffered very severely for nearly twenty years, and it seems cruel to deny them all means of proceeding against the ship when every proctor knows that it is the only remedy they ever had which is of much value.

Suggestion is sometimes made that the court may restore the old twelfth rule and give the District Courts authority in such cases to enforce the State-law lien by a proceeding *in rem.* Such an expedient was tried for many years, and it seems to me that the experience of that trial, as given by the late Chief Justice Taney, ought to deter any well-wisher of the Federal system from any attempt to re-establish a practice which so signally failed in the former trial.

Necessaries, whether for repairs or supplies, are usually ordered by the master, and the best text-writers say that his authority is sufficient to cover all such repairs and the supply of such provisions and other things as are necessary to the due employment of the ship, and that it extends even to the borrowing of money in the absence of the owner, if ready money is required for the purpose of the same employment.*

Frequent credit is indispensable in cases of emergency, and all experience shows that in many cases it cannot be obtained unless the merchant, provision-dealer, material-man, or ship-chandler is allowed a lien on the ship which may be enforced by a libel *in rem,* as the master and owner are often of too doubtful responsibility and too frequently become insolvent to enable the master to procure such necessaries without other security. State-lien laws are too complicated and pregnant with too many conditions and special regulations in their machinery to be administered in a court of admiralty, even if it be competent for this court to provide for the exercise of such a jurisdiction by a District Court sitting as a court of admiralty.

Authority to make rules, it is conceded, is vested in this

* Maclachlan on Shipping, 129; Beldon v. Campbell, 6 Exchequer, 886; 1 Conkling's Admiralty, 73.

court, and it may be that such a rule might not be productive of very serious embarrassment if the State-lien laws were *permanent* laws and gave the lien *in general terms*, without specific conditions or limitations inconsistent with the rules and principles of the maritime lien. But the State-lien laws, even in such a case, were enforced under the old twelfth rule, not as a right which the admiralty court was bound to carry into execution upon the application of the libellant. On the contrary, those who framed the rule always regarded it in the light of a lien established by a foreign country, which the admiralty court might, at its discretion, enforce under that rule in cases where it did not involve controversies beyond the limits of admiralty jurisdiction.*

Process *in rem* was authorized by that rule upon the ground that the local laws gave the lien where none was given of a maritime character, and the court in that case proceeded to say that the practice was found to be inconvenient in most cases and absolutely impracticable in others, which induced the court to repeal the rule. Different expedients have since been tried, as appears from the various modifications to which that rule has been subjected, and now it is suggested that it may become advisable to return to the practice which the justices who framed that rule found it necessary to abandon "as entirely alien to the purposes for which the admiralty power was created, and decided that it formed no part of the code of laws which the admiralty was established to administer." Before doing so it may be wise to weigh the reasons given by the justices who framed that rule as the grounds for its abandonment.

In many of the States, say the court, the laws were found not to harmonize with the principles and rules of the maritime code. Certain conditions and forms of proceeding were required to obtain the lien, and it was generally declared to be forfeited or regarded as waived after the lapse of a certain time, or upon some future contingency. These

---

* The St. Lawrence, 1 Black, 522.

conditions and limitations differed in different States, and if the process is to be used wherever the local law gives the lien it will subject the admiralty court to the necessity of examining and expounding the lien laws of every State and of carrying the same into execution, and that, too, in controversies where the existence of the lien is denied and the right depends altogether on a disputed construction of a State statute, or indeed, in some cases, of conflicting claims under the statutes of different States, as when the vessel formerly belonged to the port of another State where she also became subject to a State-law lien. Cases also arise where a third party claims a lien prior and superior to that of the libellant under the provisions of a statute of another State, and where such a controversy arises, say the court, in such a proceeding *in rem*, the admiralty court clearly has no power to decide or to adjust the prior claims in dispute, and consequently would be compelled to abandon the contest and recall its process whenever the controversy assumed that shape.

Reasons such as those given by the court in that case certainly deserve mature consideration, and it will be sufficient to refer to the lien laws of two or three of the States to show that the picture there portrayed is not overdrawn.

Work done or material furnished for or towards the building, repairing, fitting, furnishing, or equipping ships or vessels constitute, by the law of the State of New Jersey, a lien upon the ship or vessel, her tackle, apparel, or furniture, and the provision is that the lien shall continue for nine months after the debt is contracted, and that it shall be preferred to all other liens except mariners' wages.* Means are also provided in the same act to enforce such a lien if the debt amounts to the sum of twenty dollars. Application in writing must be made by the creditor to one of the magistrates named in the act for a warrant to enforce the lien and to collect the amount, but if the application is drawn in due form the officer or magistrate to whom the same is addressed

---

* Sessions Acts, 1857, p. 382.

is required to issue his warrant to the sheriff, or other proper officer, commanding him to attach, seize, and safely keep the ship or vessel, to be disposed of as directed in the same act. He must also make return of his doings in the premises within ten days, to the officer who issued the warrant, and make out, subscribe and annex thereto, a just and true inventory of all the property so seized, to be signed by him and annexed to his return.

Important duties are also imposed upon the officer who issued the warrant. He must direct that a notice containing certain prescribed requisites shall be published in one or more of the newspapers printed in the county, in order that any other person having such a lien upon the ship or vessel may deliver to the said officer an account in writing of his demand, accompanied by the prescribed affidavits and proofs; and the act provides that every such person shall be deemed an attaching creditor and shall be entitled to the same benefits and advantage and be subject to the same responsibilities and obligations as the creditor who made the first application; and the further provision is that liens not so presented and verified shall be deemed inoperative and cease.

Massachusetts has also passed laws to accomplish the same general purpose, which in effect give a lien on the ship to the material-man who, in that State, has furnished labor or labor and materials, or provisions, or stores, for or on account of such ship, to secure the payment of such debt, the lien to continue until the debt is satisfied, unless it be dissolved, as it may be, if the creditor does not within four days from the time the ship departs from the port, file in the clerk's office of the city or town a statement, subscribed and sworn to as prescribed, giving a just and true account of his demand, with all just credits and the other particulars therein required. Provision is also made for the enforcement of the lien by petition to the Superior Court of the county where the vessel was when the debt was contracted, and the mode of proceeding prescribed is that the petition may be entered in court or filed in vacation, in the clerk's

office, or may be inserted in a writ of original summons, with an order of attachment, and be served, returned, and entered as other civil actions; and that the subsequent proceedings for enforcing the lien shall, except as therein further provided, be as prescribed in the act for enforcing liens on buildings and land.*

Any number of persons having such liens upon the same ship may join in the same petition to enforce the same, and the same proceedings shall be had in regard to the respective rights of each petitioner, and the claims of all shall be marshalled to prevent a double lien for the same labor, materials, stores, or provisions, and to secure the just rights of all. Proper costs and expenses are to be deducted from the proceeds, and the residue is to be distributed among the several claimants, paying them in full or *pro rata* as circumstances may require.

Laws to the same end have been passed by the legislature of New York. Debts contracted within that State, to the amount of fifty dollars, by the master, owner, charterers, builder, or consignee of any sea-going or ocean-bound ship, on account of work done or materials or other articles furnished towards the building, repairing, fitting, furnishing, or equipping such a ship are made a lien upon the ship, her tackle, apparel, and furniture, in preference to all other liens except mariners' wages. Provisions and stores furnished, wharfage and the expense of keeping the ship in port, and services in loading and unloading the ship, and debts for towing or piloting, of the amount of twenty-five dollars, are also included in the same category and are entitled to the same lien.

Detailed means are also provided for enforcing the lien, whether the repairs and supplies are to ocean-bound ships or smaller vessels. Liens of the kind cease at the expiration of six months after the debt was contracted, unless the ship was absent from the port when the six months expired, in which case the provision is that the lien shall continue ten

---

* General Statutes of Massachusetts, 768.

days after the ship shall next return to the port, subject, however, to the condition that the debt shall cease to be a lien whenever the ship shall leave the port, unless the creditor shall, within twelve days after her departure, cause to be drawn up and filed specifications of such lien as therein provided, with a statement under oath of the amount claimed to be due, and file the same specification in the office of the clerk of the county or city, as therein more fully set forth.

Compliance with these requisites being shown the creditor may apply to a justice of the Supreme Court, at chambers, in the proper county, for a warrant to enforce the lien and to collect the amount. All the various steps required to be taken to enforce the lien and to collect the debt are then prescribed, every one of which is "alien to the purposes for which the admiralty power was created, and forms no part of the code of laws which it was established to administer."*

Separate examination of the different features of these several enactments will not be attempted, nor is it necessary, as it is manifest that any one at all acquainted with the practice in suits *in rem* will see at a glance that the admiralty courts as now organized are utterly incompetent to execute such conditions and regulations. Alterations, it is said, may be made in the organization of the District Courts to obviate that difficulty, but the incompetency of those courts to administer such regulations under existing laws is by no means the only objection to such an experiment, as it may well be doubted whether this court, in view of the great number of such enactments, and the frequent changes to which the enactment of each State is annually exposed, will be able to perform all the duties which the adoption of such a system would impose, without leaving unperformed many of the high purposes contemplated by the Constitution and the original Judiciary Act.

These several conclusions render it unnecessary to give much examination to the other objections urged by the appellees to the pretensions of the appellants, that they are

---

* 4 Stat. at Large, New York, 653.

entitled to the balance of the fund in the registry of the court by virtue of their mortgage, which has never been formally foreclosed. They are mortgagees, and inasmuch as their mortgage has never been foreclosed and their claim is opposed by the owner of the steamer, I am of the opinion that the District Court sitting as a court of admiralty had no jurisdiction of the cause of action, and that the decree of the Circuit Court reversing the decree of the District Court is correct.*

Even suppose that difficulty may be obviated, which is denied, still the governing rule of decision remains, that the appellees as material-men have a superior lien by virtue of the maritime law. Clearly that would be so in any commercial country in the world, except England, unless our own country must be included in that category. Commentators everywhere agree that by the civil law and the law of those countries which have adopted its principles, a lien upon the ship is given without any express contract, to those who repair her or furnish her with necessaries, either at home or abroad.†

Sufficient has been remarked to show that the jurisdiction of the District Courts is not limited to the particular subjects over which the admiralty courts of the parent country exercised jurisdiction when the colonists immigrated here and formed themselves into new communities, and it may be admitted, that it does not extend to all cases which would fall within it according to the civil law and the practices and usages of continental Europe.

Our ancestors, when they immigrated here, organized themselves into colonies and assumed and exercised all the powers of government. They enacted new laws, and those in operation were, in many cases, modified. Judicatories

---

* Schuchardt *v.* Ship-Angelique, 19 Howard, 241; The John Jay, 17 Id. 401; The Neptune, 3 Haggard, 132; The Dowthorpe, 2 W. Robinson, 73; The Sailor Prince, 1 Benedict, 461.

† Maude & Pollock on Shipping, 67; 1 Valin, 363, 369; Ordonnance de la Mer, Title 2, Art. 1; Cleirac Jur. de la Mer, 351, Art. 6; Casaregis Dis. 18; 2 Brown's Civil and Admiralty Law, 142; Roccus de Nav. et Nat. 82, 91–93.

were created and empowered to hear and determine legal controversies, including all those of a maritime character, wholly unrestricted by the prohibitions of the common-law courts of the country from which they had emigrated; and when in the progress of events they found it necessary and proper to frame the Federal Constitution and saw fit to provide that the judicial power shall extend to "all cases of admiralty and maritime jurisdiction," it was to the admiralty jurisdiction as it was known and understood in the States to which they referred.

Proofs of the highest character are now exhibited that the admiralty courts of the States did exercise jurisdiction over contracts for repairs and supplies furnished to domestic ships as well as to foreign ships, and it follows, as it seems to me, that the appellees in this case had a maritime lien upon the steamer and that the same attaches to the proceeds in the registry of the court below, and that the decree of the Circuit Court should be affirmed.

Mr. Justice FIELD also dissented.