P. REARDON, INC., Respondent, *v.* DANIEL CATON, Individually and as President of STEAMSHIP CLERKS' UNION, BROOKLYN AND STATEN ISLAND, LOCAL No. 975, I. L. A., an Unincorporated Association, and Others, Appellants.

Second Department, November 21, 1919.

**Injunction — labor unions — strike and boycott to compel employer to grant eight-hour day, etc.— evidence not justifying temporary injunction restraining strike.**

Suit brought by a corporation engaged in public trucking in the city of New York against certain unincorporated labor unions and individual officers and members thereof and against a trades council representing

local unions affiliated with the American Federation of Labor, and others, to obtain an injunction restraining the defendants from discriminating against the plaintiff in the receipt or delivery of freight and merchandise trucked by the plaintiff for shipment by water at various piers in the city of New York. On an *ex parte* application for an injunction *pendente lite* which was granted and continued after argument it appeared that the plaintiff conducted its business on what is known as the " open shop " basis, that is to say, employed truckmen some of whom were and some of whom were not members of labor unions, and that as the plaintiff refused to join with other employers in recognizing the eight-hour day and rate of wages paid for overtime, the defendants refused to handle freight on trucks of the plaintiff which were not driven by members of a union, but did handle merchandise delivered by trucks in charge of union employees. There were no allegations of any facts indicating violence or threats of violence on the part of the defendants nor any evidence of coercion or intimidation, the defendants disclaiming malice and justifying the strike or boycott upon the ground that they were endeavoring to compel the plaintiff to conform to an eight-hour day for labor and the payment of one dollar per hour for overtime and not insist upon a ten-hour day with fifty cents an hour for overtime. It further appeared that seventy-five per cent of the employers had voluntarily acceded to the demands of the defendants, that there was no governmental agency, or common carrier, or shipper, or receiver of freight before the court complaining of the defendants and that the plaintiff was not under the obligations of a common carrier, but could lawfully carry or refuse to carry merchandise as it saw fit.

On all the evidence, *held*, insufficient to justify a court of equity in granting said temporary injunction and that the order therefor should be reversed.

Mills and Putnam, JJ., dissented, with opinion.

Appeal by the defendants, Daniel Caton, individually, and as president, etc., and others, from an order of the Supreme Court, made at the Kings County Special Term and entered in the office of the clerk of the county of Kings on the 16th day of June, 1919, continuing, *pendente lite*, an injunction which was originally granted *ex parte* on May 7, 1919, and which restrained the defendants from practicing any discrimination against the plaintiff in the receipt or delivery of freight and merchandise trucked by plaintiff.

The controversy which is the subject of this litigation took place in the latter part of the year 1918 and the first three months of the year 1919.

The plaintiff corporation conducts an extensive public trucking business in the city of New York. Its business consists mainly in trucking freight for its customers to and

from the various railroad and steamship terminals and docks. The complaint alleges that plaintiff's investment exceeds $500,000, and the gross annual income of the business is at least $1,500,000. The defendants are unincorporated labor unions and individual officers and members thereof. The defendant Transportation Trades Council of the Port of New York is an organization of representatives of local unions affiliated with the American Federation of Labor in the transportation trades.

The other defendant unions are composed of workingmen engaged on the steamship piers and in driving trucks to and from the piers, each different department of the work having a separate union, as, for example, the steamship clerks, the checkers, the scalemen, the weighers, the pier employees, and the truck drivers and chauffeurs, organized in separate locals. It is alleged in the answers interposed and the replying affidavits read on the motion, that in the year 1918 the local unions in and about the port of New York comprised from 100,000 to 125,000 men, about ninety per cent of all the men engaged in such work.

The plaintiff conducts its business on what is known as the " open shop " basis. It employs drivers, chauffeurs and truckmen some of whom belong to one or another of the various local unions, and some who are not members of the labor unions. In the early part of the year 1919 the various local unions voted upon and adopted certain resolutions looking to the unionizing of the entire body of men engaged in this class of work. It is alleged that as a result of earlier unionizing movements the wages of the men were steadily increased, and the standard of an eight-hour working day had been generally adopted, and that over seventy-five per cent of the employers of labor had voluntarily adopted the union scale of wages and hours of work and employed only union men. It is alleged in the pleadings and affidavits used upon the motion that the plaintiff corporation and another trucking concern known as Daniels & Kennedy, refuse to join with the other employers in unionizing their men, and, while paying the same weekly rate of wages, insist upon a ten-hour working day, instead of an eight-hour day, paying but fifty cents an hour for overtime instead of one dollar per hour as demanded by the defendants.

To bring about a uniform rate of wages and hours of work by means of unionizing the entire laboring force, the various local unions and their members resolved that members of the unions should not continue to work with non-union men, and accordingly would refuse to handle merchandise brought to the piers, or called for at the piers by drivers, chauffeurs and truckmen who were not members of the union. Unsuccessful efforts were made to negotiate settlements with the plaintiff and the Daniels & Kennedy trucking concern, the plaintiff refusing to become a party to the agreement, with the result that in the latter part of April the union men working as dock foremen, clerks, weighers, checkers, etc., refused to handle freight brought to the piers by plaintiff's trucks driven by non-union men. There was no refusal to handle such freight when plaintiff's trucks were driven by employees who were members of the union. The defendants, disclaiming any malice towards the plaintiff, insist that the primary object of their refusal to deal with plaintiff's non-union employees was to better the condition of the laborers generally as to wages and working hours, and the main grievance of the defendants, as alleged, is the refusal of plaintiff to conform to the eight-hour day condition and the payment of one dollar per hour for overtime. The plaintiff alleges, however, that the demands of the laborers and their organization were arbitrary, onerous, unbearable and ruinous, and that plaintiff declined and refused to sign the agreement, which it insists it had the right to do. The result of the refusal of the union men to work with the plaintiff's non-union employees, maintained for some two weeks, seriously interfered with plaintiff's business. Plaintiff was obliged to take back freight which the union men refused to handle, or transfer it to other trucks operated by union men. Shippers and receivers of freight formerly employing plaintiff's trucks threatened to and in some cases did transfer their business to other trucking concerns, and plaintiff alleges that it is unable to carry on its business and that it has suffered and will suffer irreparable loss and damage.

This action was accordingly commenced on May 6, 1919, and a preliminary injunction obtained ex parte, restraining defendants from " practicing any discrimination against the plaintiff or its agents, servants, employees or trucks or against

any through freight, local freight, incoming freight, outgoing freight or export freight, or merchandise, trucked by the plaintiff or its agents, servants or employees or tendered by them, or either of them, for shipment or carriage by any carrier by rail or water or intended for delivery to or carriage by the plaintiff or its agents, servants, employees or trucks." An order was directed to defendants to show cause why this injunction should not be continued during the pendency of the action, on the return of which, after hearing, the learned judge at Special Term granted the plaintiff's application. It is from this order that the appeal is taken.

*Clarence J. Shearn* [*Patrick J. McDonald* with him on the brief], for the appellants.

*Paul Bonynge,* for the respondent.

KELLY, J.:

We are concerned, on this appeal, solely with the question of the legality and propriety of the preliminary injunction issued in this action, originally without notice and continued after argument.

The wrongdoing charged by the plaintiff corporation against the defendant labor unions and the individual defendants members·thereof, is the formulating of a plan to compel the plaintiff to unionize its employees, and that in pursuance of such plan the defendants have declared a boycott against the plaintiff by refusing to handle the freight or merchandise carried on or called for by the plaintiff's trucks. Stripped of adjectives and denunciatory characterization, this is the sum and substance of the defendants' alleged offense against the plaintiff. While the complaint characterizes the demands of the defendants as " arbitrary, unjust and ruinous," and avers that the defendants have conspired " to crush such of plaintiff's employees as might refuse to accept unionization " and thereby deprive them of means of livelihood and to injure and destroy plaintiff's business as the penalty for further resistance to their demand, and to " impede and stifle interstate and foreign commerce " and to generally disrupt and disorganize plaintiff's business, and while plaintiff alleges that defendant unions

have exercised compulsion upon their members, there is no allegation in the complaint of any fact indicating violence, or threats of violence, by the defendants, and the affidavits submitted by plaintiff in support of the motion for a preliminary injunction contain no evidence of violence, coercion or intimidation. On the papers presented in the record it appears that this conflict between the plaintiff and the labor organizations and their members prior to the injunction was not characterized by the use of force or violence, the defendants seeking to accomplish their ends peaceably. We are brought, therefore, to the question whether the plans resolved upon by the labor unions and their members with reference to the freight and merchandise handled by plaintiff's non-union drivers, and the refusal of the union men to load or unload the plaintiff's trucks when in charge of non-union men, were contrary to the law of the land, and whether the injunction issued was authorized. On the complaint and affidavits submitted it appears idle to argue that these defendants were actuated by any personal malice against the plaintiff corporation or its officers or non-union employees. They handled plaintiff's freight and merchandise without objection when it was in charge of drivers who were members of the union; that they had no personal objection or antagonism to the Messrs. Reardon is shown by their continued efforts to bring them into affiliation with the union, in the same way that seventy-five per cent of the employers of labor in the port of New York were in voluntary affiliation with them. So far as appears by the many affidavits, there is but one other trucking concern, Daniels & Kennedy, besides the plaintiff, who refuses to recognize the labor unions, and fifteen per cent of the plaintiff's employees are already members of the union. It, therefore, appears that the primary object of the boycott complained of was to bring about recognition of the union by the plaintiff to the end that plaintiff should recognize the eight-hour day instead of the ten hours of labor exacted by it from its employees, and pay its teamsters one dollar per hour for overwork instead of fifty cents per hour. It is difficult to see how these demands can be characterized as onerous, unbearable or ruinous if they are acceded to voluntarily by seventy-five per cent of the employers of labor. The courts are not called

upon to decide questions of public policy with regard to the existence of labor unions; we are concerned solely with the enforcement of the law of the land. Labor unions have been and are recognized as lawful associations, and when their objects and the methods employed to further them are lawful they and their individual members are entitled to the protection of the courts as well as the plaintiff corporation. The injunction granted by the order appealed from, is, in effect, a mandatory injunction. These laborers refusing to work with non-union men, the court by one of its most powerful and drastic writs has commanded them to cease this refusal and to work with these men opposed to their union organization.

If disputes of this kind are to be reviewed in courts of equity, the plaintiff must present a case in conformity with equitable principles, and upon the papers before the court on this appeal I think it fails to present such a case. The plaintiff does not make the employers, or common carriers, or shippers of freight, parties to this action. We are dealing here with the facts presented by the record, and with conditions prevailing in the months of January, February and March, 1919. We have here no dispute between employer and employee. No common carrier or employer, or shipper or receiver of freight is before the court complaining of the defendants. On the proof here one trucking concern, the plaintiff, is before the court complaining that it cannot transact its business although seventy-five per cent of the truck owners in the port of New York have no difficulty with the defendants. There is but one other trucking concern mentioned in the affidavits as involved in the same controversy, and that concern is not before the court as a plaintiff. Despite the agreement of its fellow-truck owners, the plaintiff will not agree with the defendants. And, so far as the record discloses, the immediate cause of the break between plaintiff's concern and the defendants is its refusal to accede to the demand for an eight-hour day and a dollar an hour for overtime for its drivers. These are the so-called "union rates." They are the rates paid by seventy-five per cent of the truck owners. The plaintiff pays its men the same regular wages as other truck owners, but it insists upon a ten-hour day and pays but fifty cents an hour for overtime. Of course, this gives plaintiff a great advantage over its

competitors, its profits are greater, but is the assertion of such a right sufficient to justify a court of equity in issuing a mandatory injunction without notice, since continued after argument, compelling the defendants, comprising the entire body of dock laborers in the port of New York, to work with the plaintiff's non-union employees? Because this is the effect of the injunction. There is no proof of any violence or intimidation in this record. The plaintiff's affidavits will be searched in vain for any evidence of unlawful, overt acts by the defendants. There is no evidence of any appeal to the shippers or receivers of freight to refuse employment to plaintiff. There is no evidence of malice or animosity towards the plaintiff in particular, because the defendants have never refused to handle the merchandise brought to and from the docks by its union drivers. The sole object of the refusal to deal with plaintiff's non-union employees is to bring about the same hours and the same pay for its drivers as prevail in seventy-five per cent of the trucking concerns in New York. This does not appear to be unlawful or unreasonable. (*Bossert* v. *Dhuy,* 221 N. Y. 342; *National Protective Assn.* v. *Cumming,* 170 id. 315, 320; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471; *Mills* v. *United States Printing Co.,* 99 App. Div. 605.)

In *Bossert* v. *Dhuy* (*supra*), Judge CHASE, writing for the Court of Appeals, said: " It is unnecessary in the case now under consideration to hold that in all cases and under all circumstances, whatever a man may do alone he may do in combination with others, but it was clearly established in the *National Protective Association* case " (*National Protective Assn.* v. *Cumming,* 170 N. Y. 315) " that workingmen may organize for purposes deemed beneficial to themselves and in that organized capacity may determine that their members shall not work with non-members or upon specified work or kinds of work. It was not illegal, therefore, for the defendants to refuse to allow members of the Brotherhood to work in the plaintiffs' mill with non-union men. The same reasoning results in holding that the Brotherhood may by voluntary act refuse to allow its members to work in the erection of materials furnished by a non-union shop. Such action has relation to work to be performed by its members and directly affects them.

The voluntary adoption of a rule not to work upon non-union made material and its enforcement differs only in degree from such voluntary rule and its enforcement in a particular case. Such a determination also differs entirely from a general boycott of a particular dealer or manufacturer with a malicious intent and purpose to destroy the good will or business of such dealer or manufacturer. An act, when done maliciously and for an illegal purpose, may be restrained; and held to be within the bounds of reasonable business competition when done in good faith and for a legal purpose. (See Ruling Case Law, vol. 16, pp. 431, 432 and 433.) * * * When it is determined that a labor organization can control the body of its members for the purpose of securing to them higher wages, shorter hours of labor and better relations with their employers, and as a part of such control may refuse to allow its members to work under conditions unfavorable to it, or with workingmen not in accord with the sentiments of the labor union, the right to refuse to allow them to install non-union made material follows as a matter of course, subject to there being no malice, fraud, violence, coercion, intimidation or defamation in carrying out their resolutions and orders." (Pp. 354, 364.) "The same rule applies to a body of men who, having organized for purposes deemed beneficial to themselves, refuse to work. Their reasons may seem inadequate to others, but if it seems to be in their interest as members of an organization to refuse longer to work, it is their legal right to stop." (Pp. 353, 354.) The court said further: "An association of individuals may determine that its members shall not work for specified employers of labor. The question ever is as to its purpose in reaching such determination. If the determination is reached in good faith for the purpose of bettering the condition of its members and not through malice or otherwise to injure an employer the fact that such action may result in incidental injury to the employer does not constitute a justification for issuing an injunction against enforcing such action." (P. 359.) Judge CHASE also approvingly cites the recent *Paine Lumber Company Case* (*supra*) in the United States Supreme Court, in which Mr. Justice HOLMES said at page 471, dealing with a case of refusal to handle non-union materials: "As this court is not the final authority concerning the laws of New

York we say but a word about them. We shall not believe that the ordinary action of a labor union can be made the ground of an injunction under those laws until we are so instructed by the New York Court of Appeals."

The alleged " boycott " in the *Bossert* case went much further than in the case at bar. There is no evidence in the present case of circulars or appeals to plaintiff's patrons. Nor does the recent decision of the Court of Appeals in *Auburn Draying Co.* v. *Wardell* (227 N. Y. 1) in any way militate against the defendants here, because, as Judge COLLIN points out in that case, the defendants " inaugurated and carried on, affirmatively and aggressively, through the agencies of fear and coercion, a comprehensive exclusion of the plaintiff from the business of the community," and it is this fact, Judge COLLIN says, which distinguishes the case from *Bossert* v. *Dhuy.* There is no similarity between the acts of the defendants in the *Auburn* case and the acts of the defendants in the case at bar. On the contrary, the acts of defendants complained of in the case at bar come expressly within the legitimate procedure indicated in the opinion of the Court of Appeals in that case.

But it is said that this injunction, granted originally without notice, directed to this army of more than one hundred thousand laboring men, is not mandatory; that there is no obligation on the men to continue working if they do not wish to work with plaintiff's non-union drivers. This argument, it seems to me, is no answer in a court of equity. We know that longshoremen and dock laborers who are not regularly employed, and who are paid by the hour, cannot quit their work, because of their necessities. A so-called " strike," even if it be lawful, is a serious matter, entailing loss and hardship on employer and employee, a last resort to be avoided if it be possible by united effort. It appears that in this case the defendants have continued to work because of these considerations and in obedience to the preliminary injunction of the court, which gives to the plaintiff the full relief to which it might be entitled after trial. But is the suggestion that the men may quit their work, because of the individual plaintiff's grievance, one that should commend itself to a court of equity? Events move rapidly nowadays and the disastrous results to the community of such action on the part of the men is

apparent. Is this to be brought about by injunction of a court of equity, in advance of trial of the issue, because the plaintiff for its own profit will not grant the same working day and the same pay for overtime as practically all of its associates in the trucking business? I fail to see much in the plaintiff's position commending the case to a court of equity. Labor unions and laboring men, longshoremen and dock laborers have at times resorted to violence and illegal methods to enforce their rights, or what they sometimes mistakenly asserted to be their rights, and in so doing have brought upon themselves just criticism. And they have at times been exploited by dishonest or incompetent so-called leaders who used their cause for ulterior and unlawful purposes. With such men and with such motives the law should deal strictly. But when men attempt to assert what they claim to be their rights in good faith, in a decent, orderly way without resort to violence and within the law, their interests are as sacred as those of the plaintiff, and a court of equity should see to it that they are not improperly interfered with by the writ of injunction.

But it is said that these men are employees of common carriers and that they are in a different class from the defendants whose right to refuse to handle non-union material was sustained by the Court of Appeals in *Bossert* v. *Dhuy* (*supra*). It will be remembered that on the record here presented no governmental agency, no common carrier or shipper or receiver of freight is before the court complaining of the defendants. The plaintiff is a trucking concern employed to cart freight to and fro, under no public obligation. It may carry or refuse to carry merchandise, as it sees fit. From the necessities of the case the common carrier steamship companies and the like in the port of New York cannot give regular employment to the dock laborers and employees, by the month, the week, or even by the day. The labor is uncertain, depending on the arrival and departure of vessels, and the character and quantity of freight to be moved. The men are hired and paid by the hour. They have no regular steady employment or income. It seems to me that it may be argued that it is as unreasonable to deny them the right accorded to the defendants in the *Bossert* case as it would be to insist that the common carriers should

employ their laborers regularly by the day, the week, the month or the year. I do not think these casual laborers are in the same class with regular employees of those serving the public. There are diverse contentions concerning strikes and boycotts which affect public service, but I think these are for the legislative branch of government, and no Legislature, State or National, has so far enacted that they are illegal.

I, therefore, vote to reverse the order and to deny the motion for preliminary injunction before trial.

RICH, J., concurred; JENKS, P. J., concurred in separate opinion; MILLS, J., read for affirmance, with whom PUTNAM, J., concurred.

JENKS, P. J. (concurring):

I vote for reversal of this order. My brother KELLY has stated the facts and has cited the cases.

In *Quinn* v. *Leathem* (L. R. [1901] App. Cas. 506) the lord chancellor says: "Every judgment must be read as applicable to the particular facts proved, or assumed to be proved, since the generality of the expressions which may be found there are not intended to be expositions of the whole law, but governed and qualified by the particular facts of the case in which such expressions are to be found. The other is that a case is only an authority for what it actually decides. I entirely deny that it can be quoted for a proposition that may seem to follow logically from it. Such a mode of reasoning assumes that the law is necessarily a logical code, whereas every lawyer must acknowledge that the law is not always logical at all."

The course complained of may be described accurately enough as a boycott. The sole question is whether the court was justified in granting this injunction against this boycott. The court was not justified, unless it appear that the boycott is a conspiracy to accomplish an unlawful end, or a lawful end by unlawful means, causing "irreparable damage." (*Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 437.) If the primary purpose of the boycott is to better the condition of the boycotters as laborers, and not to do irreparable injury to the plaintiff, the boycott is not unlawful. And if to

accomplish this primary purpose the means are lawful and yet there is incidental irreparable injury to the plaintiff, such injury does not make the boycott unlawful. The sole injury stated is, to my mind, but incidental. The facts, as KELLY, J., shows, do not present the issue of a common carrier who refuses carriage of goods.

So far, the facts appear by affidavits only. The trial may reveal that the facts are different from the present appearance of them, and it may establish that this boycott is a conspiracy; or the consequences of this course of the defendants may be far-reaching and conditions may follow that justify other legal remedies, either of the common law or of statutes, State or National. But that is not the concern of this court in the present litigation. The sole duty of this court is to declare the law as between the litigants now before it.

MILLS, J. (dissenting):

I feel compelled to dissent and to vote for affirmance, for the following reasons:

The plaintiff corporation conducts in the city of New York a large trucking business, owning and operating 340 horse trucks and 14 motor trucks. Its business consists mainly in trucking freight for its customers to and from the various railroad and steamship terminals in the city. The defendants are certain unincorporated labor unions and individual officers and members thereof, comprising various employees of certain common carriers, steamship companies, such as steamship clerks, checkers, scalemen, weighers, etc., engaged in handling such freight at the piers and docks of the city. The several unions involved have deliberately and formally resolved that their members shall not work with non-union men, and, therefore, shall refuse to handle merchandise brought to piers or called for thereat by drivers, chauffeurs or truckmen who are not members of the unions. Pursuant to such resolutions the defendants have refused to handle, in any way, freight with, to or for those of the plaintiff's employees who are not members of the unions or of one of them. Plaintiff conducts its business upon what is commonly known as the " open shop " basis or plan, employing men without regard to

Second Department, November, 1919. [Vol. 189.

their membership in any union. Many of its employees are not such members, while others are. For several days prior to the making of the motion defendants had persisted in such refusal to the very great damage of the plaintiff, so much so that much of the freight tendered by it at the several piers was not received, and several of its customers, from fear of such condition, had withdrawn from plaintiff their patronage and others threatened to do so. No question upon the argument was made by defendants' counsel but that the defendants intended to persist in such refusal, and in effect to compel plaintiff to reorganize its business and to conduct it upon the union basis. The action of the defendants is intentional and deliberate and defended here by their counsel as entirely rightful.

The effect of the order appealed from is not to compel any of the defendants to continue working in his present position in the employment of any given carrier, but only to compel him so long as he does continue in that position to deal therein with the non-union employees of the plaintiff the same as with the union employees of it, that is, to receive from them or deliver to them freight without regard to their being union or non-union men.

The question presented by this appeal is simply this: Can an employee of a common carrier, while acting as such, refuse to extend to any person accommodation, *e. g.,* carriage of goods or persons, upon the same terms as are extended by the carrier to the public generally? It seems to me self-evident that he cannot so refuse. He may, if he so elect, decline to work for such an employer, but if he does work for him he must give the same service to all. It seems to me likewise plain that he, as well as the employer, is subject to the injunctive process of the court. I quite agree with the view presented to us upon the argument, that one of the defendants — for example, a freight receiving clerk — can no more refuse to receive freight from a non-union truck driver than if he were acting as a conductor of a street railroad car he could refuse to receive a fare from a non-union man, and refuse to admit such person to the car as passenger. It is a primary duty of any one engaged in the performance of such a public service to extend that service to all without

discrimination. There is no precedent to the contrary. The proposition thus asserted appears to me to be elementary. It is not at all contrary to the doctrine of *Bossert* v. *Dhuy* (221 N. Y. 342), which merely sustains the right of union men to decline to work with or upon the product of non-union laborers in private employment. The point here is that these defendants are undertaking, while choosing to render a public service, to discriminate in its performance against a certain class of people. That they may not do.

Therefore, the order appealed from should be affirmed, with ten dollars costs and disbursements.

PUTNAM, J., concurred.

Order reversed, with ten dollars costs and disbursements, and motion denied, with ten dollars costs.