The New York Lumber Trade Association and Others, Respondents, *v.* Martin Lacey, Individually and as President of the Transportation Trades Council of the Port of New York and Vicinity, and Others, Appellants, Impleaded with Fred England, Individually and as Representing Local 920 of the International Longshoremen's Association and the Members Thereof, and Others, Defendants.*

Second Department, July 12, 1935.

* Revg. 154 Misc. 747.

*Louis B. Boudin* [*Edward C. Maguire* with him on the brief], for labor union appellants.

*Raymond E. Stefferson*, for the appellant Luckenbach Steamship Co., Inc.

*Ray Rood Allen*, for steamship appellants.

*Walter Gordon Merritt* [*Walter K. Bennett, Franklin P. Ferguson* and *Henry Clifton, Jr.*, with him on the brief], for the respondents.

HAGARTY, J.  Plaintiffs are twenty-eight individual shippers and an association, known as the New York Lumber Trade Association, comprising one hundred and ten shippers, all engaged in manufacturing and distributing merchandise and dependent in part upon the flow of interstate and foreign commerce in and out of the port of New York and, necessarily, the handling thereof through the terminal facilities and steamships operated by the defendant carriers.  Their grievance is that the carriers will not accept or deliver freight from their terminals unless the delivery trucks supplied by the plaintiffs are manned by teamsters or drivers who are members of the defendant teamsters' union.  The defendant carriers, nearly all of whom are members of the New York Shipping Association, which association comprises fifty-six steamship lines, admit the refusal, but claim that they would be willing to accept and deliver freight regardless of the manner of delivery, were it not for the fear that their employees, longshoremen and checkers, who are members exclusively of the defendant longshoremen's union, will strike if compelled or ordered so to do by the defendant labor unions.

The relations between the carriers and their employees are governed by contracts entered into on the 22d day of October, 1934, effective as of the 1st day of October, 1934, for a period of

one year thereafter. These contracts are the result of collective bargaining between the shipping association and the longshoremen's association, as were preceding contracts, under which preference as to employment is given to members of the union, with fixation of hours and wages and other incidents, including a method of arbitration outlined for the purpose of settling disputes between the parties.

Although these contracts do not refer to the complained-of practice on the part of the carriers and their employees, the fact is that, prior to their execution, the unions, longshoremen and teamsters, had resolved upon a course of proceeding designed, apparently, to bring about a complete unionization of the teamsters and drivers of all trucks which were operated at the piers or terminals, including those of the plaintiffs in question here. To bring about this result, the practice was originally more drastic and extensive than was that which obtained immediately prior to the commencement of this action, since as late as the 6th of September, 1934, the refusal of the longshoremen and checkers extended to shippers who employed *any* non-union chauffeurs or drivers or who employed non-union men in connection with the production of merchandise. Pickets, maintained by the unions, enforced this refusal; individual longshoremen who disobeyed orders with respect to refusal to check or handle non-union freight were subject to discipline, and the carriers were informed that if they attempted to require their employees to check or handle such freight a strike of all employees would ensue. Thereupon the carriers acquiesced in the practice. Thereafter and on or about the 14th day of September, 1934, the union defendants limited the extensiveness of the refusal to trucks manned by non-union employees, so that there was no objection to the receipt or delivery of freight by trucks manned by union employees regardless of the practice of employment by the shippers elsewhere. The result is that shippers who employ non-union teamsters exclusively are obliged to employ public union truckmen to transport freight to and from the piers.

The teamsters are not as completely unionized as the longshoremen and checkers, but the members of that union handle a substantial portion of the freight moving in and out of the port of New York, of which the freight of the plaintiffs is but a small percentage. The union rate of wages for drivers and helpers is generally higher than that paid by the plaintiffs, and all of the union defendants here involved believe it to be to their advantage not to check or handle freight transported by trucks operated by non-union employees and, in the matters as to which complaint

is made, have been actuated by that belief and motive. A requirement that the longshoremen and checkers handle the freight of the plaintiffs will give the latter an advantage over all concerns in the vicinity of New York city which employ union drivers and helpers and will tend to limit the market for the labor of members of the teamsters' union. There is no evidence that that union has refused to take into membership any of the plaintiffs' drivers or helpers.

The situation is a simple one wherein the two unions have combined for the purpose of aiding each other, and the piers at the port of New York are the strategic points at which such a combination becomes effective. The advantage to the teamsters' union is obvious. The advantage to the longshoremen's union lies in the fact that if the teamsters' union becomes completely unionized, then, in the event of difficulty between the longshoremen and the checkers on the one side, and the carriers on the other, resulting in strike, the trucking of all freight to and from the piers would be under the control of union labor.

Alleging that the practice is a conspiracy between the unions and the carriers in violation of the Federal shipping and anti-trust acts, and also in violation of the common law, the plaintiffs have sought and obtained by the judgment at Special Term an injunction perpetually restraining the defendants from combining and conspiring together in any manner to injure and destroy the plaintiffs' business and from taking any steps to interfere with the rights of the plaintiffs to ship in and out of the docks, piers and terminals of the carriers without discrimination; from inducing the longshoremen and checkers not to perform their usual duties with respect to plaintiffs' freight because the latter employ non-union truckmen; from picketing for the purpose of carrying on the conspiracy; from instigating or participating in a strike because of the requirement to handle plaintiffs' freight, and from failing to take reasonable steps to prevent the performance of such acts by persons acting under the direction and control of the defendants. The injunction, in substance if not in form, is a mandatory one requiring the acceptance and transportation of the freight of the plaintiffs by the defendant carriers.

If this case were dependent simply upon the right of the longshoremen and checkers to insist upon dealing with none but union drivers and helpers, irrespective of the status of their employers as common carriers, it is well settled that an injunction would not lie. There is no question here that the union defendants are acting in pursuance of their belief as to their best interests, nor has their action been attended with violence or with a primary or secondary boycott.

*Bossert* v. *Dhuy* (166 App. Div. 251; revd., 221 N. Y. 342), presented an analogous situation wherein union carpenters refused to work on building construction projects when trim and flooring were furnished by a mill employing non-union labor. Distinguishing between stoppage of work based upon the principle of self-interest and a situation where a boycott ensued as the result of malicious intent, Judge CHASE, writing for the Court of Appeals, concludes (pp. 364, 365): " We think that the rules laid down by this court in the *National Protective Association Case* [170 N. Y. 315] require a reversal of the judgment in favor of the plaintiffs upon the findings before us. When it is determined that a labor organization can control the body of its members for the purpose of securing to them higher wages, shorter hours of labor and better relations with their employers, and as a part of such control may refuse to allow its members to work under conditions unfavorable to it, or with workingmen not in accord with the sentiments of the labor union, the right to refuse to allow them to install non-union made material follows as a matter of course, subject to there being no malice, fraud, violence, coercion, intimidation or defamation in carrying out their resolutions and orders."

Even more pertinent is *Reardon, Inc.*, v. *Caton* (189 App. Div. 501), where this court considered the precise situation at hand save as to the duty of the carriers, as such, to accept merchandise without discrimination. KELLY, J., writing for the majority in reversing an injunction granted to a trucking corporation restraining the defendant unions from discriminating against it by refusing to permit their members as dock workers to handle freight so trucked, and, relying upon the *Bossert Case* (*supra*), stated (p. 511): " I fail to see much in the plaintiff's position commending the case to a court of equity. Labor unions and laboring men, longshoremen and dock laborers have at times resorted to violence and illegal methods to enforce their rights, or what they sometimes mistakenly asserted to be their rights, and in so doing have brought upon themselves just criticism. And they have at times been exploited by dishonest or incompetent so-called leaders who used their cause for ulterior and unlawful purposes. With such men and with such motives the law should deal strictly. But when men attempt to assert what they claim to be their rights in good faith, in a decent, orderly way without resort to violence and within the law, their interests are as sacred as those of the plaintiff, and a court of equity should see to it that they are not improperly interfered with by the writ of injunction."

Again, in *Willson & Adams Co.* v. *Pearce* (240 App. Div. 718; affd., 264 N. Y. 521) the Court of Appeals affirmed a judgment

of this court reversing an injunction restraining the defendant unions from combining to prevent their members, engaged in transporting building materials, from handling such materials produced by plaintiff's non-union employees.

The case of *Auburn Draying Co.* v. *Wardell* (227 N. Y. 1) may be readily distinguished, as it was in the *Reardon* and *Willson & Adams Co. Cases* (*supra*), inasmuch as there the defendant teamsters' union, shortly after its organization, informed the plaintiff, a trucking corporation working on an " open shop " basis, that unless it took the necessary means to get its teamsters to join the union it would be placed on the " unfair list." This threat eventuated in a boycott when the plaintiff refused, and not only did the union place plaintiff on its " unfair list " but actively campaigned among its customers for withdrawal of their patronage from plaintiff. Plaintiff's customers acceded to the demands of the union under fear that, unless they did so, they themselves would be subjected to similar punitive measures, all of which elements, controlling in that case, are absent here.

The present case, however, differs in one vital respect from the foregoing authorities, and that is, that the defendant carriers are concededly common carriers by water, engaged in interstate and foreign commerce. Therefore, the respondents contend that, as such, they are bound to deal with shippers without discrimination. But, antecedent to a consideration of that issue, there is the necessity of determining the claim of the appellants that the State court is without jurisdiction to use its equitable processes by way of injunctive relief which, in effect, promulgates a rule regulating interstate and foreign commerce by sea.

Thus we are faced with a consideration of the scope and exclusiveness of Federal maritime jurisdiction, both legislative and judicial. Such jurisdiction is derived not only from article 1, section 8, clause 3, of the Constitution of the United States, endowing Congress with power " to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," but also from article 3, section 2, of the Constitution of the United States, vesting in its judicial power " all Cases of admiralty and maritime Jurisdiction."

Within those fields it is necessary only to point out that the authority of the Federal government is paramount and pre-emptive when exercised. Actions looking toward enforcement of rights accruing from Federal legislation may be entertained in the State courts except where jurisdiction in the Federal courts is expressly or impliedly reserved. (*Second Employers' Liability Cases*, 223

U. S. 1, 57, 58; *Claflin* v. *Houseman*, 93 id. 130, 136, 137; *Galveston, H. & S. A. R. Co.* v. *Wallace*, 223 id. 481, 490.)

There seems to be a substantial difference between the scope of jurisdiction permitted by the Federal government to the States under the constitutional provision regulating commerce and that permitted under the constitutional provision which reserves to the judicial power of the United States, and inherent therein the legislative power, admiralty and maritime jurisdiction. This is a subject which will be adverted to later. For the present, however, a brief review of the Anti-Trust Acts and the Interstate Commerce Acts will be helpful to an understanding of the provisions of the Shipping Act which superseded them *pro tanto*, and which latter act, the appellants claim, serves to vest exclusive jurisdiction of the subject-matter of this controversy in the administrative body created therein, the Shipping Board, in the first instance, and in any event exclusively in the Federal courts.

The Sherman Anti-Trust Act, enacted on the 2d day of July, 1890 (26 U. S. Stat. at Large, 209; U. S. Code, tit. 15, §§ 1–7, 15), was aimed to prevent a combination or conspiracy in restraint of trade or commerce among the several States or between the States and foreign nations, and it specified four modes of relief, namely: (1) A criminal proceeding, (2) a suit in equity in the name of the United States to restrain violations, (3) a proceeding in the name of the United States for forfeiture of property in the course of transportation, and (4) an action by any person or corporation for recovery of threefold damages for injury done to business or property by some other person or corporation. (See *Minnesota* v. *Northern Securities Co.*, 194 U. S. 48, 68.) These remedies were intended to be exclusive. (*General Inv. Co.* v. *Lake Shore R. Co.*, 260 U. S. 261, 286.) Under that act a suit for an injunction could not be maintained in a State court, but that exclusiveness was relaxed when the act was supplemented by the Clayton Anti-Trust Act (Chap. 323, 38 U. S. Stat. at Large, 730, 737, Oct. 1914; U. S. Code, tit. 15, § 26), section 16 thereof permitting injunctive relief in any court of the United States, in common with conditions and principles motivating a court of equity, excepting, however, from the scope of such injunctive relief a suit against any common carrier subject to the provisions of the Interstate Commerce Act in respect to any subject-matter within the jurisdiction of the Interstate Commerce Commission. Even so, jurisdiction to grant injunctive relief is exclusively in the Federal courts. The act provides by implication for such exclusive jurisdiction, and an injunction proceeding commenced in a State court, even though subsequently transferred to a Federal court, was held void for want of jurisdiction. (*General Inv. Co.* v. *Lake Shore R. Co., supra*, 287, 288.)

The Interstate Commerce Act (U. S. Code, tit. 49, §§ 1–27 *et seq.*) has been in effect, as amended from time to time, since 1887, and concerns itself with the general regulation of common carriers by land, making it the duty of such carriers to charge only just and reasonable rates, forbidding unjust preferences and discriminations and setting up a Commission as a body endowed with plenary power to supervise the conduct of carriers, to investigate their affairs and methods of dealing, and, generally, to enforce the provisions of the act. The act itself affords means of redress to injured persons, and the Commission is empowered to hear complaints concerning violations, to investigate such complaints, and not only to direct reparation to the injured party, but to order the carrier to desist from such violation in the future. In addition, by the ninth section of that act, an injured person has an election to make complaint and secure relief from the Commission, or to bring suit for recovery of damages in the Federal courts, and, by section 22, existing appropriate common-law and statutory remedies available to an injured person are also saved. In its specific scope the Commerce Act supersedes the general provisions of the Anti-Trust Act, and under the Commerce Act it is necessary to go further than merely to prove a combination or conspiracy; it must also be shown that the result of the combination is itself a violation of the act. (See *Keogh* v. *C. & N. W. R. Co.*, 260 U. S. 156.)

In view of the express saving in the Commerce Act of these common-law and statutory remedies and the election afforded an injured person, litigation has arisen as to the necessity of recourse to the Interstate Commerce Commission in the first instance. It has been held, generally, that where complaint has been made of a rate or unfair practice, the Commission has jurisdiction in the first instance, despite the aforesaid sections, for, otherwise, uniformity of regulation would be lost, and, furthermore, the alert suitor would gain an advantage over his competitors who did not dispute the ruling, rate or practice. In *Texas & Pac. R. Co.* v. *Abilene Cotton Oil Co.* (204 U. S. 426) a shipper claimed to be entitled to a refund representing an alleged excess over a fair rate; in *Baltimore & Ohio R. R. Co.* v. *Pitcairn Coal Co.* (215 U. S. 481) the method of distribution of coal cars was claimed to be discriminatory; in *Mitchell Coal Co.* v. *Pennsylvania R. R. Co.* (230 U. S. 247) the complaint was that the carrier gave a rebate to a competitor; and in *Board of Railroad Comrs.* v. *Great Northern R. Co.* (281 U. S. 412) the question was presented as to whether intrastate railroad rates ordered by State authority worked an unreasonable dis-

crimination against interstate commerce. In all of these cases the holding was that the Commission had exclusive jurisdiction in the first instance.

On the other hand, in *Pennsylvania R. R. Co.* v. *Puritan Coal Co.* (237 U. S. 121) the complaint was that a carrier did not furnish sufficient cars as required by law, a State statute providing for a *pro rata* share; in *Illinois Cent. R. R. Co.* v. *Mulberry Coal Co.* (238 U. S. 275) a State statute required the carrier to furnish cars within a reasonable time after demand for them, which requirement was held not to constitute a burden upon interstate commerce so as to be void, in the absence of legislation by Congress; in *Great Northern R. Co.* v. *Merchants Elev. Co.* (259 U. S. 285) a question of construction of tariff rates was presented to a State court, recovery of an excess being sought; in *Pennsylvania R. R. Co.* v. *Sonman Coal Co.* (242 U. S. 120) failure to supply a sufficient number of cars was the basis of an action for money damages in a State court, the Commerce Act, unlike the subsequent Shipping Act, being explicit in its provisions as to car service. In all of these cases it was held that recourse to the Commission was unnecessary.

In the *Great Northern R. Co. Case* (*supra*, 291) Mr. Justice BRANDEIS wrote: " Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute."

The distinction in principle between the two classes of cases, *i. e.*, where recourse to the Commission is prerequisite and where it is unnecessary, is set forth in the *Puritan Coal Co. Case (supra,* pp. 131, 132), viz.: " But it must be borne in mind that there are two forms of discrimination — one in the rule and the other in the manner of its enforcement; one in promulgating a discriminatory rule, the other in the unfair enforcement of a reasonable rule. In a suit where the rule of practice itself is attacked as unfair or discriminatory, a question is raised which calls for the exercise of the judgment and discretion of the administrative power which has been vested by Congress in the Commission. It is for that body to say whether such a rule unjustly discriminates against one class of shippers in favor of another. Until that body has declared the practice to be discriminatory and unjust no court has jurisdiction of a suit against an interstate carrier for damages occasioned by its enforcement. When the Commission has declared the rule to be unjust, redress must be sought before the Commission or in the United States courts of competent jurisdiction as provided in § 9. But if the carrier's rule, fair on its face, has been unequally applied and the suit is for damages, occasioned by its violation or discriminatory enforcement, there is no administrative question involved, the courts being called on to decide a mere question of fact as to whether the carrier has violated the rule to plaintiff's damage. Such suits though against an interstate carrier for damages arising in interstate commerce, may be prosecuted either in the State or Federal courts."

For the reasons stated, it may be assumed that it is the rule that, ordinarily, complaints of unfair practices must be submitted in the first instance to the Commission. Claim is made by the respondents that the exception to this rule governs here, and that the unfair practice of which complaint is made is, in reality, a discriminatory enforcement of a fair rule. But, manifestly, the gravamen of the action is a rule promulgated by the carriers, which is of general application, and that is to deal with shippers only in the event that their trucks are manned by union employees. It is the rule itself and not the enforcement thereof which is in issue here. Moreover, such actions as did accrue under State jurisdiction were for enforcement of money damages only, and such judgments did not purport to lay down a rule of conduct for the future. Again, as pointed out by Mr. Justice VAN DEVANTER in the *Sonman Case (supra,* 123–125), " If the act said nothing more on the subject [namely, if it had omitted section 22 thereof] it well may be that no action for damages resulting from a violation of the act could be entertained by a State court."

This consideration leads to an examination of the provisions of the Shipping Act of 1916, as amended by the Merchant Marine Act of 1920 (See U. S. Code, tit. 46, §§ 801–842; 861–889) as interpreted by *United States Nav. Co.* v. *Cunard S. S. Co.* (284 U. S. 474).

That act, as the counterpart of the Commerce Act, is intended to regulate generally the rates and practices of common carriers by sea, as the Commerce Act regulates common carriers by land. It provides the same scheme for setting up a supervisory board, designated as the Shipping Board (now known as the Shipping Board Bureau of the Department of Commerce, by virtue of Executive order of the President of the United States, No. 6166, June 10, 1933). But as to sea carriers, the Shipping Board, unlike the Commerce Commission, seems to be endowed, in the first instance, with supervision as broad and comprehensive as and co-extensive with the subject-matter of the act itself. There are no clauses saving remedies nor granting alternative modes of relief to be found in the Shipping Act. Among other things it is provided that (§§ 816, 817) " Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." " Every common carrier by water in interstate commerce shall establish, observe, and enforce just and reasonable rates, fares, charges, classifications, and tariffs, and just and reasonable regulations and practices relating thereto and to the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the carrying of personal, sample, and excess baggage, the facilities for transportation, and all other matters relating to or connected with the receiving, handling, transporting, storing, or delivering of property." And section 817 further provides: " Whenever the board finds that any rate, fare, charge, classification, tariff, regulation, or practice, demanded, charged, collected, or observed by such carrier is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum rate, fare, or charge, or a just and reasonable classification, tariff, regulation, or practice."

Complaints may be made to the Board by injured persons, and the Board is empowered to conduct hearings and investigations and to make orders for full reparation (§ 821). Enforcement of orders

of the Board for money damages by judicial proceedings in a Federal District Court or any State court of general jurisdiction is comprehended by section 829. *This is the only section in the entire act which contemplates an action in a State court.* Enforcement of orders of the Board, other than those for the payment of a sum of money by judicial proceedings, is limited to an application to a Federal District Court which is empowered to " enforce obedience thereto by a writ of injunction or other proper process, mandatory or otherwise " (§ 828). In addition, various violations are punishable by penalties and in certain instances constitute misdemeanors. Finally, the Secretary of the Treasury is authorized to refuse clearance to a vessel whenever he shall have satisfactory reason to believe that a carrier refuses to accept or receive freight (§ 834).

Review of orders of the Board with power to enforce, suspend or set aside in whole or in part any such order is vested in the courts of the United States (§ 830).

It is difficult to believe that this comprehensive act could not have been invoked by the respondents if they had desired to have recourse to it. Indeed, in their complaint, the plaintiffs rely upon a violation of its provisions.

In the *Cunard Case* (*supra*) the plaintiff sought an injunction in a Federal District Court on the ground that the defendants, in violation of the Anti-Trust Act, had entered into an unlawful combination and conspiracy to put into effect and to continue a scheme whereby they would establish a contract rate lower than the general rate made available to shippers who used their lines exclusively. Pointing out that the Shipping Act supersedes the Anti-Trust Act in its field and parallels the Commerce Act, Mr. Justice SUTHERLAND, in holding that recourse to the Board was a prerequisite, wrote (p. 485): " The act is restrictive in its operation upon some of the activities of common carriers by water, and permissive in respect of others. Their business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge. Whether a given agreement among such carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal. Compare *Chicago Board of Trade*

v. *United States*, 246 U. S. 231, 238; *United States* v. *Hamburgh-American S. S. Line*, 216 Fed. 971."

Important, too, is the observation that the holding that recourse to the Board in the first instance, as a prerequisite, rests upon stronger ground than recourse to the Commission under the Commerce Act, as in the Shipping Act, unlike the Commerce Act, there is no provision saving common-law or statutory remedies (pp. 485, 486).

It may be contended here that the failure to deal with shippers unless they employed union teamsters was so plain a violation of the obligations of the carriers as not to require a finding or order by an administrative Board, but it seems that Congress contemplated, in enacting the Shipping Act, that the Board constitute a channel through which every violation and unfair practice of whatever character must flow, not only in the interest of uniformity, but also because of the necessity of meeting changing economic conditions in the regulation of interstate commerce and commerce with foreign nations, so that shippers might compete favorably and on even terms in all markets. If, as in the *Cunard* case, conspiracy resulted in rates to favored shippers lower than the general rate, illegality became apparent, but as to that feature Mr. Justice SUTHERLAND wrote (p. 487): " And whatever may be the form of the agreement, and whether it be lawful or unlawful upon its face, Congress undoubtedly intended that the Board should possess the authority primarily to hear and adjudge the matter. For the courts to take jurisdiction in advance of such hearing and determination would be to usurp that authority. Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications."

The respondents seek to escape the force of the Shipping Act by asserting that their right to an injunction is not based upon any particular statute, but is based upon general equitable principles to prevent damage from acts in furtherance of an unlawful conspiracy. Such a conspiracy was urged in the *Cunard Case (supra)*, and Mr. Justice SUTHERLAND said (p. 485): " A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, without going into detail, that the allegations either constitute direct and basic charges of violations of these provisions or are so interrelated with such charges as to be in effect a component part of them; and the remedy is that afforded by the Shipping Act, which to that extent supersedes the anti-trust laws. Compare

*Keogh* v. *Chicago & N. W. R. Co., supra,* at p. 162. The matter, therefore, is within the exclusive preliminary jurisdiction of the Shipping Board."

The fruition of the conspiracy is an allegedly unfair practice visited upon the plaintiffs by the carriers, and thus the case is brought squarely within the province of the Shipping Act and of the Board. Respondents question the efficacy of the Shipping Act to furnish relief on the ground that it does not reach the union defendants but simply relates to carriers. That is on the assumption that the Board will find that the carriers are violating the law by refusing the shipments, not as a matter of choice but as an alternative to a general strike by the defendant unions upon whom depends the movement of freight along the entire waterfront of the Port. In any event, if an order of the Shipping Board, aimed at the carrier, with the effective modes of enforcement prescribed by the act, is not sufficiently persuasive to accomplish fair treatment, assuming that the alleged discrimination be found unfair, relief may be accorded under the provisions of sections 828 and 830 (U. S. Code, tit. 46) by including all other persons conspiring with the carrier to bring about the unfair and illegal result.

Even if the subject-matter were beyond the province of the Shipping Board to determine in the first instance, the jurisdiction of a State court is limited under the act to judgment for money damages based upon an order of the Board. An injunction would not lie in a State court, as the power to issue injunctive relief is reserved by implication to the Federal courts in the same manner as that reservation was accomplished in the anti-trust laws. (*General Inv. Co.* v. *Lake Shore R. Co., supra.*) Even in a Federal court an injunction will not issue to restrain the use of "fighting ships" which are specifically and expressly condemned in the act, on the ground that the Board has primary jurisdiction. (*Wisconsin & Michigan Transp. Co.* v. *Pere Marquette L. S.,* 67 F. [2d] 937.)

In any event, and even if it be assumed that the Shipping Act itself is not applicable, the proper forum for the injunctive relief sought is exclusively the Federal courts. This is a case within the cognizance of the admiralty jurisdiction of the Federal government, dependent upon contractual rights. (*Atlantic Transport Co.* v. *Imbrovek,* 234 U. S. 52.) Money damages may be awarded in State courts in certain instances for wrongs perpetrated by common carriers by land or by sea, and, in certain other instances, State legislation affecting intrastate commerce has been held not to constitute a burden upon interstate commerce. But Federal admiralty jurisdiction is more jealously guarded, as shown by the United States Judicial Code and as pointed out in *Southern Pacific Co.* v.

*Jensen* (244 U. S. 205, 215, 216): " By § 9, Judiciary Act of 1789, 1 Stat. 76, 77, the District Courts of the United States were given ' exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction; * * * saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it.' And this grant has been continued. Judicial Code, §§ 24 and 256." Mr. Justice McREYNOLDS, writing in the *Jensen* case, approvingly quotes from *The Lottawanna* (21 Wall. 558), viz. (p. 215): " In *The Lottawanna*, Mr. Justice BRADLEY speaking for the court said: ' That we have a maritime law of our own, operative throughout the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend " to all cases of admiralty and maritime jurisdiction." * * * One thing, however, is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been intended to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign States.' "

It was there held (*Jensen Case, supra*) that workmen's compensation laws enacted by a State could not be adapted to admiralty jurisdiction, as the remedy therein afforded " is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court and is not saved to suitors from the grant of exclusive jurisdiction." In adhering to this ruling in *Knickerbocker Ice Co.* v. *Stewart* (253 U. S. 149), Mr. Justice McREYNOLDS wrote (p. 160): " As the plain result of these recent opinions and the earlier cases upon which they are based, we accept the following doctrine: The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction. Moreover, it took from the States all power, by legislation or *judicial decision*, to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations. To preserve adequate harmony and appropriate uniform rules relating to maritime matters and bring them

within control of the Federal Government was the fundamental purpose; and to such definite end Congress was empowered to legislate within that sphere."

The precise scope of the common-law remedies reserved under the Judicial Code is nebulous at best, and the source itself of admiralty law, as distinguished from common law, is a subject of dispute. (*Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. at p. 61; dissenting opinion of Mr. Justice HOLMES in the *Knickerbocker Case*, supra, p. 167; Benedict Admiralty, vol. 1 [5th ed.], §§ 8, 10.) But whatever the status of common-law remedies which are available in State courts, it is clear that injunctive relief, a creature of equity, may not be so characterized. Moreover, what this injunction effectuates is simply the establishment of a ruling or doctrine binding upon carriers by sea in perpetuity, which is really of a legislative or administrative nature rather than judicial. (*Great Northern R. Co.* v. *Merchants Elev. Co.*, 259 U. S. 285, 291; *Prentis* v. *Atlantic Coast Line*, 211 id. 210, 226, 227.)

It follows that the judgment must be reversed for want of jurisdiction, and it is, therefore, unnecessary to consider the applicability of the anti-injunction acts, State and Federal, also invoked by the appellants. It would seem that the expression of public policy, as enunciated in the so-called " Norris-LaGuardia Act " (Chap. 90, 47 U. S. Stat. at Large, 70; U. S. Code, tit. 29, §§ 101–115, enacted the 23d day of March, 1932), precludes the issuance of an injunction contrary thereto as against labor unions. While it is true that the act takes the power to issue such injunctions from the Federal District Courts alone, save in certain limited cases, its constitutionality has been upheld in that respect. (*Levering & Garrigues Co.* v. *Morrin*, 71 F. [2d] 284; *Cinderella Theater Co.* v. *Sign Writers' Local Union*, 6 Fed. Supp. 164; *Dean* v. *Mayo*, 8 id. 73.) It is clear, therefore, that if this action had been commenced in a Federal District Court no injunction could have been granted as against the defendant unions. Jurisdiction of the subject-matter of this action is here, if at all, only by acquiescence of the Federal government, and certainly those substantive rights which may be so enforced are circumscribed by the transcendent public policy of the Federal government. Mr. Justice PECKHAM writes in *United States* v. *Freight Association* (166 U. S. 290, 340, 341): " The public policy of the Government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case

is what the statute enacts. If the law prohibit any contract or combination in restraint of trade or commerce, a contract or combination made in violation of such law is void, whatever may have been theretofore decided by the courts to have been the public policy of the country on that subject." To hold otherwise would create an anomalous situation, wherein State courts of subordinate jurisdiction would be endowed with greater powers to afford relief for violation of rights growing out of Federal jurisdiction than the Federal courts themselves.

For the same reason it is unnecessary to consider the so-called " Quinn-Neustein Act " (Laws of 1935, chap. 477), as that legislation, obviously patterned after the Federal anti-injunction act, went into effect upon its adoption on the 25th day of April, 1935, more than two months after the entry of the judgment under review. Our decision is limited to those questions which were presented to the court of original jurisdiction. (*Delaney* v. *Brett*, 51 N. Y. 78, 81, 82.)

The judgment should be reversed on the law, with costs, and the complaint dismissed, with costs.

LAZANSKY, P. J., SCUDDER, TOMPKINS and JOHNSTON, JJ., concur.

Judgment reversed on the law, with costs, and the complaint dismissed, with costs. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and conclusions will be made.

Settle order on notice.